737 F.2d 1038
 237 U.S.App.D.C. 333
 Anne Elisabeth KOLLER, an infant, By and Through John Lamont
KOLLER and Cynthia Anne Koller, her natural
guardians, et al.
James G. Butler, Nicholas R. Allis and the law firm of
Butler, Jefferson, Dan & Allis, Appellants,
v.
RICHARDSON-MERRELL INC., a Delaware Corporation.
 No. 84-5039.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 22, 1984.
Decided May 29, 1984.
As Amended July 16, 1984.
Certiorari Granted Oct. 15, 1984.
See 105 S. Ct. 290.
 
 Jacob A. Stein, Washington, D.C., with whom Robert Muse and Robert M. Weinberg, Washington, D.C., were on the brief, for appellants.
 Lawrence E. Walsh, Oklahoma City, Okl., with whom Richard C. Ford, Oklahoma City, Okl., Guy M. Struve, Whitney L. Schmidt, New York City, Vincent H. Cohen and Robert B. Cave, Washington, D.C., were on the brief, for appellee, Richardson-Merrell Inc.
 Boisfeuillet Jones, Jr. and Carol D. Melamed, Washington, D.C., were on the brief for amicus curiae, Washington Post Company, urging reversal.
 Anthony Z. Roisman, Washington, D.C., was on the brief for amicus curiae, Trial Lawyers for Public Justice, urging reversal.
 Stephen H. Glickman and Arthur B. Spitzer, Washington, D.C., were on the brief for amicus curiae, American Civil Liberties Union Fund of the National Capitol Area, urging reversal.
 Barry J. Nace, Washington, D.C., entered an appearance for amicus curiae, Association of Plaintiff's Trial Attorneys of Metropolitan Washington, D.C., urging reversal.
 Before WALD and MIKVA, Circuit Judges, and RICHEY,* United States District Judge for the District of Columbia.
 Opinion for the Court filed by Circuit Judge WALD.
 Concurring opinion filed by District Judge CHARLES R. RICHEY.
 WALD, Circuit Judge:
 
 
 1
 This appeal arises out of a lawsuit filed in May, 1980, in which plaintiffs Cynthia and John Koller and their daughter Anne Elizabeth Koller allege that Mrs. Koller's ingestion during the first trimester of her pregnancy of the anti-nausea drug Bendectin, which is manufactured by the defendant, caused the severe limb malformations with which her daughter was born. Shortly before trial was to begin, two separate episodes gave rise to allegations of misconduct against plaintiffs' counsel and a motion by the defendant to impose sanctions against them. Following extensive discovery and hearings, the district court in its ruling of January 6, 1984, revoked the pro hac vice appearances of Nicholas Allis and James Butler and disqualified their firm, Butler, Jefferson, Dan & Allis, from further representation of the plaintiffs.[1] The court held that Allis had attempted to "thwart a true investigation of a crucial witness" by obtaining a statement from his (Allis') secretary declaring that representatives of the defendant were pressuring her to sign a false statement that the Koller case was a fraud. The court also determined that Butler, in an unrelated episode, had deliberately circumvented the court's pretrial evidentiary rulings when he released to Morton Mintz, a Washington Post reporter, information that had recently been ruled inadmissible at trial on the alleged connection between Bendectin and the congenital deformities of fourteen infants. Allis, Butler, their law firm and the plaintiffs appeal from the district court's order.[2]
 
 
 2
 We must determine first whether we have jurisdiction to review this interlocutory order in light of the Supreme Court's recent decision in Flanagan v. United States, --- U.S. ----, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984), holding that there was no jurisdiction to entertain an interlocutory appeal by defendants in a criminal case of an order disqualifying their counsel. We conclude that an order disqualifying counsel in a civil proceeding, at least in the circumstances present here, is immediately reviewable. We conclude on the merits that the district court erred in revoking the pro hac vice appearances of Allis and Butler and in disqualifying the Butler firm. We therefore reverse and remand with instructions to reinstate the pro hac vice appearances of plaintiffs' counsel.
 
 I. BACKGROUND
 
 3
 In May, 1980, plaintiffs filed suit in federal district court alleging that Anne Koller had been born without arms and legs because her mother, Cynthia, had taken Bendectin, an anti-nausea drug manufactured by the defendant, Richardson-Merrell,[3] during the first trimester of her pregnancy. In January, 1981, plaintiffs retained the law firm of Butler, Jefferson, Dan & Allis to represent them in the litigation. James Butler and Nicholas Allis were admitted pro hac vice to appear in the case.[4] Two key issues that emerged during pretrial discovery were whether Mrs. Koller had in fact taken Bendectin during the critical first three months of her pregnancy[5] and whether Bendectin was a teratogen--i.e., a substance that causes birth defects. After two-and-a-half years of pretrial discovery and preparation, the events described below brought a virtual halt to proceedings on the merits.
 
 A. The Janowski Episode[6]
 
 4
 On the evening of Sunday, December 26, 1982, Richard Daum, a paralegal with the Butler firm, notified Allis that he had just received a telephone call from Krystyna Janowski, Allis' secretary. According to Daum, Janowski had told him that she was being threatened and bribed by George Barnes, an investigator employed by defendant's law firm, Davis, Polk & Wardwell, to induce her to sign a false statement to the effect that Cynthia Koller had not taken Bendectin in the first trimester of her pregnancy.[7]
 
 
 5
 The following day Allis decided, with other members of the Butler firm, to talk with Janowski. After a brief telephone conversation with Janowski, Allis went to meet her at the hospital where she was tending to her own prematurely-born infant. There she repeated in greater detail what she had said the previous evening: that the defendant, through its investigator Barnes, was pressuring her to sign what she said was a false statement that Mrs. Koller had admitted to Janowski that she had not taken Bendectin until after the first trimester of her pregnancy; that this pressure was in the form of promises to take care of her "wants and needs" and her child's medical expenses, and threats to reveal her criminal record; that in fact she had never had any such conversation with Mrs. Koller.[8] Although Janowski seems to have admitted during this conversation that she had called Davis, Polk at some point, she insisted that it was only at the instigation of the defendant and denied saying anything about the Koller case being fraudulent.[9] Janowski indicated to Allis her willingness to sign a statement confirming these events.[10]
 
 
 6
 That evening Allis and Humphries, an investigator employed by the firm, went to Janowski's apartment with a short written statement for Janowski to review and sign. They recorded the conversation with a small concealed tape recorder. The transcripts of the tape[11] reflect that during the conversation Janowski once again repeated the story she had related to Allis earlier that defendants were trying to induce her to sign a false statement about Mrs. Koller, and she confirmed her willingness at that time to sign a statement for Allis describing those inducements.[12] She took the statement produced by Allis, made minor corrections and a few comments confirming its accuracy, and signed it. At Allis' suggestion she wrote at the bottom of the statement, "Under penalty of perjury, I swear that the above typed statement is true and correct." The statement reads as follows:
 
 
 7
 Last week I was in a state of severe agitation and depression and felt a lot of hostility towards the law firm of Butler, Jefferson, Dan & Allis. Today I feel calm and my mind is free and clear. At no time did I ever hear Cynthia Koller or anyone else say that Cynthia Koller did not take Bendectin. George L. Barnes & Associates, Inc. had been trying to get me to sign a statement saying that I heard Cynthia Koller say that she did not take Bendectin. Such a statement would be false and I would not sign such a statement for that reason. Mr. Barnes and others have promised that if I signed such a statement they would be able to relocate me and would take care of all my wants and needs including renting a comfortable apartment for me and by [sic] baby. Any conversation I had with George Barnes, Patrick Ryan or any other person from Davis Polk & Wardwell or George Barnes & Associates was at a time when I was extremely upset and under great emotional stress. At the present time my mind is free and clear and everything in this statement is true and correct. I have been promised no remuneration of any kind by any representative of Butler, Jefferson, Dan & Allis for stating these true statements or for anything else.
 
 
 8
 J.A. 1504 (emphasis in original). Janowski also gave Allis a statement in her handwriting describing the conversation that she said defendants wanted her to "recall" and swear to.[13] She indicated that she would be willing to make a longer, more detailed statement in the immediate future. She also suggested that she might go to Mexico to get away from the pressures she was under. Finally, Allis discussed with Janowski the possibility of bringing a typewriter to her apartment to allow her to work at home.[14]
 
 
 9
 On the following day, December 28, 1982, the Butler firm received a copy of a letter which Davis, Polk had sent to the court.[15] The letter stated that Davis, Polk had received two calls on December 22 from a woman identifying herself as Allis' secretary and stating that the Koller case was fraudulent. The next day defense counsel had called the court to attempt to set up a conference before Christmas. (In oral argument we learned that in this December 23 call, made several days before the defense first contacted plaintiffs' counsel, defense counsel also told the court's law clerk the substance of Janowski's call.) The letter continued; after identifying the caller as Janowski, defense counsel arranged for "independent counsel" to advise her.[16] The letter stated further that Janowski had been threatened by the Butler firm with imprisonment if she persisted in a course of disclosure. The letter concluded, "We respectfully request a conference with the Court so that it may, if it deems fit, prevent intrusion by any party or its counsel until the informant and her counsel have had an opportunity to evaluate the substance of the information and, if appropriate, inform the Court."
 
 
 10
 The same day, December 28, Butler prepared and sent to the court a letter in response, read and approved by Allis, in which he described what contact the firm had had with Janowski in the previous two days and the information she had given them.[17] He added that the firm had learned that, according to Janowski, representatives of the defendant had offered her $15,000 to sign a statement that the case was fraudulent.[18] Butler expressed concern over the situation, especially defendant's conduct, and waived the attorney-client privilege as to any conversations between Janowski and Mrs. Koller. He also enclosed a copy of the statement signed by Janowski the previous evening and a copy of the handwritten description of the purported conversation with Mrs. Koller that, according to Janowski, Barnes wanted her to "recall."
 
 
 11
 On December 29, defense counsel moved for permission to take expedited discovery of Janowski and others. On the same day, one of defendant's attorneys attempted unsuccessfully to get a statement from Janowski. On January 3, 1983, Carl Schuck, the attorney that the defendant arranged for and paid to represent Janowski, wrote to the court stating that his client now disavowed the December 27 statement she had signed for Allis, and that the statement had been obtained under duress and with an offer to continue paying her salary and fringe benefits, including medical benefits for her baby, without requiring her to perform any work.[19]
 
 
 12
 First, the district court authorized the depositions of Janowski and the father of her child,[20] and additional discovery into the question of when Mrs. Koller took Bendectin, including the depositions of Barnes, Humphries, and the Kollers.[21] The court also ruled as to all these depositions that the plaintiffs' waiver of the attorney-client privilege could not be limited to conversations between Janowski and Mrs. Koller, but would extend to "any discussion relating to the issue of when Cynthia Koller took Bendectin during her pregnancy."[22] Janowski testified in essence that Mrs. Koller had admitted to her that she had not taken Bendectin in the first trimester,[23] and that she called the Davis, Polk office with this information,[24] but that when Barnes and other representatives of the defendant tried to get a statement from her she had second thoughts. She testified that she lied to Allis, telling him that the defense was bribing her to sign a false statement,[25] and that she signed the December 27 statement for Allis, even though it was false, in return for a promise of continued employment.[26] Plaintiffs impeached Janowski's credibility with evidence of a history of mental instability, job-related dishonesty and criminal activity, admitted propensity for lying, hostility toward the Butler firm, financial benefits from defendant's firm, prior inconsistent statements, internal inconsistencies, and contrary record evidence.[27] Janowski's counsel, Schuck, acknowledged at the deposition that the defense was paying for the costs of his representation of Janowski, as well as a $600 per month apartment, a rental car, and medical expenses for her baby (to be reimbursed by insurance).[28]
 
 
 13
 After reading Janowski's deposition and hearing argument from both sides, the court orally ordered the depositions of Allis and one of defense counsel, Patrick Ryan, who had attempted to take Janowski's statement on behalf of the defendant, on February 9. J.A. 600-01. On March 7, the court ordered an evidentiary hearing, during which defense counsel examined Butler, Allis, Dan (another attorney with the Butler firm), Daum, Humphries, Allen Eaton (one of plaintiffs' Washington counsel), and Mrs. Koller. In the depositions and the evidentiary hearing, defense counsel was permitted to inquire in detail into numerous discussions between the plaintiffs and their counsel and within the Butler law firm itself during the previous year and, with respect to the week of December 26 through December 31, into every telephone call, every meeting, and every action within the Butler firm that had any bearing on the case.
 
 
 14
 Initially, as evidenced by its ruling on the attorney-client privilege and on the scope of additional discovery, the court was concerned with whether Mrs. Koller had taken Bendectin during the critical period as she claimed, and with what counsel knew about that matter. As far as we can tell, this new inquiry gave rise to no motions or rulings by the court at that time based on the supposition that fraud had occurred; the court appeared to be prepared to send to the jury the conflicting evidence on the critical issue of when Mrs. Koller might have taken Bendectin.[29] By March 7, when the court ordered evidentiary hearings into the Janowski episode, the attention of the court had shifted to the question of precisely what Allis' intentions were in preparing and presenting to the court Janowski's December 27, 1982, statement.[30]
 
 
 15
 Allis testified that his intention was to pursue zealously the interests of his clients, the legitimacy of whose claim he had no reason to doubt. In accordance with his clients' interests, he sought to ascertain the facts surrounding the episode and then, especially in view of the possibility that Janowski might go to Mexico, to obtain a signed statement affirming the essentials of what Janowski had repeatedly related and what he believed to be true--i.e., that representatives of the defendant were pressuring her to sign a false statement "recalling" a conversation in which Koller admitted not taking Bendectin and saying that the case was fraudulent.[31] Allis acknowledged that, in the event Janowski had made such a statement to the defense, the December 27 statement would be a "retraction" of that prior statement.[32]
 
 
 16
 Allis also acknowledged that he had a strong suspicion by the evening of the 27th that, despite her denials, Janowski might at some point have said something to encourage Barnes and the defendant to the effect that the case was fraudulent.[33] Furthermore, at least by the morning of the 28th when defendant's letter arrived, he and the firm had learned that Janowski had told defense counsel that the case was fraudulent.[34] Allis testified, however, that he still believed without reservation that any such communication was false, and that Barnes and others were pressuring her to sign a statement repeating the false charge.[35]
 
 
 17
 B. Butler's Release of Inadmissible Materials to the Press
 
 
 18
 In the midst of these events, an unrelated episode involving James Butler also aroused the court's ire and resulted in the revocation of his pro hac vice appearance. In support of their contentions that Bendectin was a teratogen and had caused Anne Koller's birth defects, plaintiffs sought to introduce evidence of numerous other instances in which women had taken Bendectin during the critical period and, like Mrs. Koller, had borne children with severely malformed or absent extremities. Defendant moved to exclude this evidence. On January 17, 1983, the district court issued a pretrial evidentiary ruling excluding the "drug experience reports" (DERs) regarding two of those instances--Marco Cordova and Pauline Sands--on which plaintiffs' experts had intended to rely in their testimony. J.A. 131. The court concluded that the dangers of prejudice and jury confusion outweighed any probative value that these case histories might have. J.A. 132-36. In another order dated January 28 and filed January 31, 1983, the court ruled that, of the many other DERs filed with the FDA concerning the alleged link between Bendectin and birth defects, plaintiffs could introduce only five, each of which must have been initiated within one year of the birth of the deformed child. J.A. 157-66.
 
 
 19
 On January 28, 1983, James Butler sent to FDA Commissioner Hayes fourteen DERs for severely deformed children whose mothers had allegedly taken Bendectin, including Koller, Sand and Cordova. He enclosed medical information and photographs of the children along with a letter urging the FDA to "take this noxious product off the market before it can do any more harm." J.A. 1513. At the same time, Butler sent copies of the DERs and his letter to Hayes to Morton Mintz, a reporter with the Washington Post who had often written about drug companies and the FDA. J.A. 1515. Mintz contacted Butler for an interview which took place on February 1, 1983. Mintz also contacted Merrell-Dow, Richardson-Merrell's successor company.[36]
 
 
 20
 On February 7, 1983, the Washington Post carried an article by Mintz reporting Butler's claims that Bendectin was a teratogen, along with the comments of FDA officials, "[t]he FDA's most relentless critic, the Public Citizen Health Research Group," and Merrell-Dow, all of which took the position that there was no evidence establishing that Bendectin caused birth defects. The company's representative was quoted as specifically denying that there was a causal link in the Koller case, and as stating in addition that "there is a serious question when Mrs. Koller may have taken Bendectin." J.A. 1516. At the time the Mintz article appeared, the jury panel for February had just been drawn and the parties were preparing for jury selection and a trial expected to commence in the next few weeks. Primarily as a result of the article and the disqualification proceeding it helped to trigger, the trial was postponed.
 
 
 21
 In two affidavits filed in February and May, 1983, in response to a motion by the defendant to impose sanctions on the Butler firm, Butler denied any intent to influence the jury in circumvention of the January evidentiary rulings. J.A. 271, 273-74. Butler stated as his sole motivation that over two years of research on Bendectin had convinced him that it was a dangerous drug that should be taken off the market without further delay. Apparently as an explanation for the particular timing of the release on January 28, he averred that not until January had he received authorization from the parents to release the information to the FDA and the press. J.A. 273. He declined the court's suggestion that he testify in person as to the explanation for his conduct.
 
 C. Proceedings on the Motion to Disqualify
 
 22
 On February 7, the day the Mintz article was published, the defendant moved to disqualify the Butler firm on the basis of both the Janowski episode and, especially, Butler's release of the DERs. After an evidentiary hearing in March, 1983, on the Janowski episode, the court issued on April 29, 1983, an Order to Show Cause why the Butler firm should not be disqualified from further representation of plaintiffs because of the conduct of both Butler and Allis:
 
 
 23
 1) James Butler's January 31, 1983, release of information concerning defendant's experience with Bendectin, Thalidomide, and MER-29, including fourteen [DERs], to the [FDA] and the Washington Post in an effort to prejudice the jury pool awaiting selection for the contemplated trial of this action in February or March and to bring inadmissible evidence before the jury pool in contempt of three separate evidentiary rulings previously entered by the Court;
 
 
 24
 2) Nicholas Allis' preparing and obtaining a statement from Krystyna Janowski retracting her previous statement to defendant that the instant case was fraudulent without regard for the truth of Ms. Janowski's retraction in an apparent attempt to protect the Butler firm's financial interest in this and other related matters by thwarting any further investigation into the circumstances surrounding and the basis for Ms. Janowski's original statement.
 
 
 25
 J.A. 207-08. After additional hearings in June and July, again focusing primarily on Allis' conduct in the Janowski episode, the court issued its ruling on January 6, 1984, revoking the pro hac vice appearances of Butler and Allis and disqualifying the firm from further appearances in the case.
 
 
 26
 The court determined first that because "an attorney's admission pro hac vice in a case is the granting of a privilege and not a right," the revocation of pro hac vice admission was similarly discretionary and was justified whenever "the conduct of the attorney was so impermissible as to warrant" such a sanction. Memorandum Opinion of Jan. 6, 1984, at 4-5 [hereinafter cited as "Opinion"], J.A. 236-37. The court went on to find that the conduct of both Allis and Butler was "so impermissible" as to warrant revocation of their appearances and disqualification of their firm.
 
 
 27
 The court held that "[t]here is no doubt that Allis, under the broad provisions of Canon 7 and Canon 2 of the Code, has the duty and ethical obligation to not only zealously pursue the interests of his clients but also to investigate whether Cynthia Koller was committing a fraud upon the court thereby making this suit worthless and a waste of judicial resources," citing DR 7-102(A)(3), 7-102(A)(6), and DR 2-110(B)(1). Opinion at 6, J.A. 238. The court found that Allis' primary purpose in securing the statement from Janowski was to obtain a "retraction." In addition the court found fault in
 
 
 28
 1) Allis' collaboration with Humphries to surreptitiously record a portion of his conversation with Janowski; 2) Allis' testimony under oath that he had no intention of informing the court of the results of his "investigation"; 3) Allis' failure to read the prepared statement line-by-line to Janowski to insure that she understood the contents of the statement before signing; and 4) Allis' procurement of the statement irrespective of the erratic behavior displayed by Janowski during his visit on December 27.
 
 
 29
 Opinion at 6-7, J.A. 238-39. The court concluded,
 
 
 30
 At best, Allis' conduct can be characterized as an attempt to thwart a true investigation of a crucial witness in this case in pursuit of protecting the interests of his clients. Clearly, this is not the nature of an investigation where the objective is to ascertain the truth and thereby to assist in preventing any acts of fraud upon the court. See DR 7-102(B)(1).
 
 
 31
 Opinion at 7, J.A. 239.
 
 
 32
 Turning to the conduct of James Butler, the court found that "Butler's knowing release to the Post of information previously ruled inadmissible ... was a flagrant circumvention of the Orders of this Court." Opinion at 8, J.A. 240. Butler's refusal to supplement his affidavits by explaining his action in court "merely buttress[es] the Court's conclusion that his release of the DERs to the media was calculated to prejudice the defendant's case and circumvent the Court's prior rulings." Id.
 
 
 33
 Observing that disqualification of the Butler firm would not be fatal to the plaintiffs' case insofar as "remaining counsel [could] provide the plaintiffs with competent counsel," id., the court concluded that "the course of conduct of plaintiffs' counsel as a whole was so impermissible as to warrant this Court's exercise of its discretion to revoke the pro hac vice appearances of Nicholas Allis and James Butler, thereby disqualifying the Butler firm from further representation of the plaintiffs in this case." Opinion at 9, J.A. 241.
 
 
 34
 Plaintiffs and their counsel appealed. On their emergency motion, we stayed all proceedings pending an expedited appeal.[37] We determine first whether we have jurisdiction to review this interlocutory order.
 
 II. REVIEWABILITY
 
 35
 The final judgment rule embodied in 28 U.S.C. Sec. 1291 bars interlocutory appeals in all but a small class of orders "which finally determine claims of right separable from and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole cause is adjudicated." Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). To fall within this narrow exception, the order for which review is sought, "[f]irst, 'must conclusively determine the disputed question'; second, it must 'resolve an important issue completely separate from the merits of the action'; third, it must 'be effectively unreviewable on appeal from a final judgment.' Flanagan v. United States, --- U.S. ----, 104 S.Ct. 1051, 1055, 79 L.Ed.2d 288 (1984) [hereinafter cited as "Flanagan"] (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978)).
 
 
 36
 In Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 373-78, 101 S.Ct. 669, 672-75, 66 L.Ed.2d 571 (1981), the court held unreviewable an order denying a motion to disqualify counsel in a civil case, leaving open the question of the appealability of an order granting such a motion or an order in a criminal case granting or denying such a motion. In the years following Firestone, all courts of appeal that considered the question, including this court in Groper v. Taff, 717 F.2d 1415, 1417 (D.C.Cir.1983), concluded that orders disqualifying counsel in civil cases were appealable under the standards articulated in Cohen and Coopers & Lybrand.[38] In Groper, we emphasized that "an order granting disqualification in a civil case is, as a practical matter, 'effectively unreviewable' on appeal from a final judgment on the merits." 717 F.2d at 1417. We cited Duncan v. Merrill Lynch, Pierce, Fenner & Smith, 646 F.2d 1020, 1026-27 (5th Cir.), cert. denied, 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981), in which the Fifth Circuit considered at length the application of the Cohen test to disqualification orders. The court in Duncan concluded that the effect of the disqualification order is "immediate and measurable. The party opposing the motion is abruptly deprived of his counsel, and, provided he desires to proceed with his action, the litigation is disrupted while he secures new counsel." Id. at 1027. In addition, the court saw little possibility of vindication on appeal from a final judgment. It would be, the court pointed out, "an almost insurmountable burden" for the losing party "to show that he lost the case because he was improperly forced to change counsel." Id. (quoting Armstrong v. McAlpin, 625 F.2d 433, 440-41 (2d Cir.1980), vacated on other grounds, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981)).
 
 
 37
 Very recently, however, the Supreme Court determined in Flanagan v. United States, 104 S.Ct. 1051, that a disqualification order in a criminal case was not immediately appealable.[39] At the outset the Court stressed that the policy underlying the final judgment rule "is at its strongest in the field of criminal law," id. at 1054 (quoting United States v. Hollywood Motor Car Co., 458 U.S. 263, 265, 102 S.Ct. 3081, 3083, 73 L.Ed.2d 754 (1982)), and that exceptions permitting interlocutory appeals in criminal cases were accordingly very rare.[40] The rationale for such a stringent application of the final judgment rule in criminal cases lies in the common interest of the defendant, the prosecution and the public in the prompt adjudication of guilt or innocence, an interest embodied in the constitutional right to a speedy trial. Id. 104 S.Ct. at 1054-55. The defendant now argues that, although it has not actively opposed immediate review in this case, "the reasoning of the Court in Flanagan supports the conclusion that orders disqualifying attorneys in civil cases are not appealable." Memorandum of Defendant-Appellee concerning Appellate Jurisdiction at 10. We disagree. We conclude, with the Second Circuit, see Interco Systems, Inc. v. Omni Corporate Services, 733 F.2d 253 at 255 (2d Cir.1984), that Flanagan does not bar the immediate appeal of disqualification orders in civil cases.
 
 
 38
 In civil cases there is no equivalent to the constitutional right to a speedy trial, which protects the interest of the defendant, strongly shared by the prosecution and the society as a whole, in prompt adjudication, and which demands extraordinary limits on the collateral order doctrine. Thus, while courts have interpreted the collateral order doctrine extremely narrowly in criminal cases, they have permitted the immediate appeal of a variety of orders in civil cases.[41]
 
 
 39
 Not only is the constitutional requirement of speedy adjudication lacking in civil cases, but it has become apparent that the interests of the parties in proceeding expeditiously may diverge significantly. The tactical use of motions to disqualify counsel in order to delay proceedings, deprive the opposing party of counsel of its choice, and harass and embarrass the opponent has become so prevalent in large civil cases in recent years as to prompt frequent judicial and academic commentary. See, e.g., Board of Education of New York City v. Nyquist, 590 F.2d 1241, 1246 (2d Cir.1979); Williamsburg Wax Museum v. Historic Figures, Inc., 501 F.Supp. 326, 331 (D.D.C.1980), aff'd sub nom. National Souvenir Center, Inc. v. Historic Figures, Inc., 728 F.2d 503 at 517-518 (D.C.Cir.1984); Crocker, "The Ethics of Moving to Disqualify Opposing Counsel for Conflict of Interest," 1979 Duke L.J. 1310; Comment, 45 U.Chi.L.Rev. 450 (1978). We are aware of no comparable phenomenon in criminal cases. The apparent interest of many civil litigants in delaying adjudication and their use of disqualification motions to help accomplish that end militate in favor of immediate review of orders granting such motions. To insulate from prompt review an erroneous order granting a motion to disqualify counsel would only raise the stakes in this dangerous game. Of course, these policy considerations do not alleviate the necessity for meeting the three-part test of Cohen and Coopers-Lybrand; they do, however, caution against an overly mechanical application of the Flanagan analysis in the context of a civil case.
 
 
 40
 For an order to be immediately appealable under Cohen, it must first "conclusively determine the disputed question." The Court in Flanagan did not consider whether a disqualification order in a criminal case met this first criterion, but in any event we reaffirm our conclusion in Groper that an order disqualifying counsel in a civil case "conclusively determine[s] the disputed question." See Groper v. Taff, 717 F.2d at 1417. Cf. Firestone, 449 U.S. at 375, 101 S.Ct. at 674 (order denying disqualification conclusively determines question). The first part of the Cohen/Coopers-Lybrand test is therefore met. It is the Court's application of the second and third parts of the test in Flanagan--requiring that the order resolve an issue separate from the merits and that it be effectively unreviewable on appeal from a final judgment--that demands a deeper probe into the vitality of our holding in Groper v. Taff.
 
 
 41
 In Flanagan, The Court was faced with the criminal defendants' assertion that the disqualification order was erroneous and violated their sixth amendment right to counsel. The Court expressed no view as to whether the constitutional right asserted was such that an erroneous disqualification of chosen counsel would result in reversal of a conviction automatically or only upon a showing of prejudice, but found at least one of the Cohen criteria unsatisfied in either case. If erroneous disqualification would result in automatic reversal, then the order was not "effectively unreviewable on appeal from a final judgment." 104 S.Ct. at 1056. If, on the other hand, the right would be violated only if prejudice resulted, then the validity of the order would not be independent of the issues tried and could only be evaluated after the trial was complete. Id. at 1056-57. In either case, then, one of the three requirements for immediate review would not be met.
 
 
 42
 We do not believe that the Court's "either/or" analysis in Flanagan can be appropriately applied in the civil context. Unlike a criminal case, there is in a civil case no constitutional right to counsel, the deprivation of which might result in automatic reversal of an adverse judgment. Cf. Flanagan, 104 S.Ct. at 1056. In that respect the Flanagan analysis is inapplicable. Only an erroneous disqualification combined with prejudice at trial could conceivably result in outright reversal of a civil judgment. Yet it would appear virtually impossible to show prejudice resulting from the absence of one counsel and the substitution of another. In a criminal case, a reviewing court could at least draw from the extensive body of law concerning effective assistance of counsel as a first step in determining whether substitute counsel's performance prejudiced the defense so as to require reversal.[42] In the civil context, however, the court would be without a starting point; because there is no sixth amendment right involved, there is no body of law to help a court evaluate whether a civil judgment should be overturned because of the quality of counsel's representation. The court would be relegated to the realm of after-the-fact speculation about whether the disqualified counsel would have devised a superior strategy, been more persuasive and appealing to the jury, more effectively cross-examined the opposing party's witnesses, and so on. We agree with the Fifth Circuit in Duncan, 646 F.2d at 1027, that the party attempting to obtain relief from an erroneous disqualification order after losing its case-in-chief would bear "an almost insurmountable burden."
 
 
 43
 The difficulty in showing prejudice would be particularly acute if, for instance, plaintiffs were awarded a judgment but the damages fell far below what they believe they were entitled to and what they believe their chosen counsel could have obtained. On the other hand, if the civil litigant were unable to retain adequate substitute counsel willing to take over in midstream, perhaps on a contingency fee basis, and were forced to dismiss the case voluntarily, it is not clear that any appeal would be available. In a criminal case, of course, the defendant has a constitutional right to effective assistance of counsel. Our concerns about the difficulty of demonstrating prejudice at the end of a case are only heightened by the fact that neither party cites a single case in which a civil judgment on the merits of a case was reversed because of an erroneous disqualification of counsel.[43] For all of these reasons, in a civil case more certainly than in a criminal case, the disqualification order would be, "as a practical matter, 'effectively unreviewable' on appeal from a final judgment on the merits," Groper v. Taff, 717 F.2d at 1417, and thus meets the third criterion of Cohen. We would have grave misgivings about denying immediate review of an order depriving civil litigants of counsel of their choice when it is clear that there can be no effective review at the end of the case.
 
 
 44
 Flanagan's analysis of the second Cohen requirement--that the issue be completely separate from the merits of the action--is similarly inapplicable. The Court in Flanagan determined that if the criminal defendants' rights would be violated by the disqualification order and their convictions reversed only if the prejudice resulted at trial, then the order's "validity cannot be adequately reviewed until trial is complete," and would not be independent of the issues at trial. Defendant argues here that since a final judgment in its favor would be reversed only if plaintiffs could show that the disqualification order was erroneous and that it prejudiced their case, the "validity" of this order would depend on the events at trial. We reject this argument for several reasons.
 
 
 45
 As we have already discussed, it would be virtually impossible for plaintiffs here to show that prejudice resulted at trial from an erroneous disqualification. On the other hand, the extensive record now before us presents an entirely adequate basis for determining whether the district court's order was proper. That determination does not depend on subsequent events at trial, does not require us to "make any step toward final disposition of the merits of the case and will not be merged in final judgment." Cohen, 337 U.S. at 546, 69 S.Ct. at 1225.
 
 
 46
 As best we can discern, the Supreme Court in Flanagan viewed as "invalid" only those erroneous disqualification orders that violate a defendant's sixth amendment right and thus require reversal of a conviction--whether because of presumptive or demonstrated prejudice. We must conclude that this unusual view of an order's "validity" is based on considerations that are peculiar to criminal cases and do not extend to the civil context. First, of course, the defendants' assertion of their sixth amendment right to counsel as the basis for their claim may have led the Court to equate the "validity" of a disqualification order with the absence of a sixth amendment violation. We cannot perform that equation in a civil case, since there is no equivalent constitutional right at issue. Second, because of the particularly strong shared interests of the defendant, the state and the public in a speedy adjudication of guilt or innocence in criminal cases, the Court may have been especially unwilling to permit an interlocutory appeal merely to correct an erroneous ruling where the defendant might still be acquitted or, in case prejudice is not to be presumed but must be demonstrated, where no prejudice may result. The extraordinary concern for prompt adjudication in criminal cases thus provided additional reason in Flanagan to reject the usual distinction between error, which in circumstances like those before us can be determined independent of the issues at trial, and prejudicial error requiring reversal of the judgment, which often cannot.
 
 
 47
 The Court in Flanagan concluded that the question for which review was sought--whether the disqualification order violated the defendants' sixth amendment right to counsel--was either fully reviewable on completion of the trial or not fully reviewable until the completion of the trial. We conclude, in contrast, that the order appealed from in this civil case would be effectively unreviewable on appeal from a final judgment, and is properly reviewable on the record now before us.
 
 
 48
 One final consideration recommends the availability of immediate review in this case. Denying review in the case before us could irremediably prejudice not only the important interests of the clients in counsel of their choice but also the interest of the attorneys, who are parties to this appeal, in correcting what they claim is an erroneous finding of misconduct. The interest of counsel is an issue that was not even considered by the Court in Flanagan, where only the defendants appealed. In any event, the basis for disqualification in Flanagan was simply the potential for conflict arising from counsel's representation of multiple defendants, see 104 S.Ct. at 1052-53, and not unethical conduct carrying with it great stigma and serious consequences for the attorney's professional reputation. In the event that plaintiffs were satisfied with the final verdict obtained by substitute counsel, the disqualified attorneys could be left with no means whatsoever of vindicating their own important interests on appeal from a final judgment. See Duncan, 646 F.2d at 1027. The interest of counsel in this case further bolsters our conclusion that a disqualification order in a civil case such as this is appealable under the collateral order doctrine. Even assuming that Flanagan would preclude immediate review of a disqualification order in a criminal case where counsel asserted its own interest in correcting a stigmatizing ruling, the reasonable assertion of those interests in a civil case, in which the collateral order doctrine has been given somewhat broader application, provides additional grounds for affording immediate review of the disqualification order here.
 
 
 49
 For all of the above reasons, we conclude that Flanagan does not require us to depart from our recent decision in Groper v. Taff, 717 F.2d 1415, holding that orders disqualifying counsel in civil cases are immediately appealable under the collateral order exception to the final judgment rule. We proceed now to the merits of the disqualification order.
 
 III. ISSUES
 
 50
 The district court has wide discretion in the exercise of its duty to supervise members of the bar appearing before it. See Groper v. Taff, 717 F.2d at 1418. In reviewing the court's decision, we are bound to accept the court's findings on disputed issues of fact unless they are clearly erroneous. The district court's conclusions of law, including its interpretation of the Code of Professional Responsibility, and its application of the law to the facts are of course subject to appellate review for legal error.[44]
 
 A. Preliminary Observations
 
 51
 Butler and Allis, who do not maintain offices in the District of Columbia, may enter an appearance before the district court not as a matter of right, but only with joint local counsel and with the permission of the district court to appear pro hac vice.[45] The district court deemed it "well settled that an attorney's admission pro hac vice in a case is the granting of a privilege and not a right." Opinion at 4, J.A. 236 (citing In re Belli, 371 F.Supp. 111 (D.D.C.1974)). The court concluded on that basis that there was "no strict test for determining whether a non-resident attorney's pro hac vice appearance in a case should be revoked during the course of a trial," and that "conduct which may fall short of a violation of a Disciplinary Rule of the Code of Professional Responsibility may be sufficiently impermissible to warrant the denial or revocation of an attorney's pro hac vice appearance." Opinion at 4-5, J.A. 236-37.
 
 
 52
 We cannot agree with the judge's premise that pro hac vice counsel, once admitted, are subject to disqualification more readily than are regularly admitted counsel. Nothing in the local rules of the district court[46] or in our cases suggests such a distinction. Our recent decision in Groper v. Taff, 717 F.2d 1415, involved the disqualification of counsel admitted pro hac vice. Id. at 1419. This fact was noted only parenthetically and in no way affected our resolution of the question of whether he had been properly disqualified. Like the Third Circuit, "we think it clear that limited to one case though the right of these attorneys to practice was, their standing with respect to this case was no different from that of any other regularly admitted local lawyer." Cooper v. Hutchinson, 184 F.2d 119, 123 (3d Cir.1950).[47] Particularly in the federal courts of the District of Columbia, we think it would be unwise to introduce into litigation an unwarranted disadvantage against parties with non-resident counsel by subjecting that counsel more readily to removal. We thus conclude that the district court's premise that pro hac vice counsel may be disqualified more readily than regularly admitted counsel, was erroneous.
 
 
 53
 Appellees contend, however, that the conduct of Allis and Butler provides adequate grounds for disqualification under the standards applicable to regularly admitted attorneys. Local Rule 4-3(IV) of the District Court for the District of Columbia provides for disciplinary action, after notice and hearing, against attorneys for "misconduct defined in these Rules, and for good cause shown." Misconduct is defined as "[a]cts or omissions ... which violate the [District of Columbia] Code of Professional Responsibility ... except as otherwise provided by specific Rules of this court." Our task, then, is not only to determine whether Allis and Butler have violated the Code of Professional Responsibility, but if so, whether there is good cause for the particular disciplinary action taken by the court.
 
 
 54
 The two episodes of alleged misconduct before us in this case are fundamentally different from others in which we have previously upheld disqualification. We have approved or even on occasion mandated disqualification where a conflict of interest--potential or actual--between current clients undermined the court's confidence in counsel's ability to serve each client with undivided loyalty, see, e.g., Yablonski v. United Mine Workers, 454 F.2d 1036 (D.C.Cir.1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972); Yablonski v. UMW, 448 F.2d 1175 (D.C.Cir.1971); where a lawyer would likely be called as a witness in the main case, thus compromising his effectiveness as an advocate, Groper v. Taff, 717 F.2d 1415, 1418 (D.C.Cir.1983); or where counsel's prior work on the same or related matters as a government official may create an appearance of impropriety in contravention of DR 9-101(B). Kessenich v. Commodity Futures Trading Commission, 684 F.2d 88, 98 (D.C.Cir.1982).[48]
 
 
 55
 Similarly, the Second Circuit in surveying its own cases, concluded that
 
 
 56
 "with rare exceptions, disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair advantage.
 
 
 57
 Board of Education of New York City v. Nyquist, 590 F.2d 1241, 1246 (2d Cir.1979) (citations and footnotes omitted). Although our own cases, fewer in number, cannot be so neatly categorized, they are basically consistent with the Second Circuit's admonition that "unless an attorney's conduct tends to 'taint the underlying trial,' by disturbing the balance of the presentations in one of the two ways indicated above, courts should be quite hesitant to disqualify an attorney." Id. at 1246 (citation omitted). Indeed, we see much wisdom in the view expressed by Judge Mansfield in concurrence:
 
 
 58
 The attorney is the client's choice. Disqualification is wasteful and time-consuming. Only where the attorney's unprofessional conduct may affect the outcome of the case is there any necessity to nip it in the bud. Otherwise conventional disciplinary machinery should be used and, if this is inadequate, the organized bar must assume the burden of making it effective as a deterrent.
 
 
 59
 Id. at 1247-48.
 
 
 60
 We agree that disqualification is warranted only rarely in cases where there is neither a serious question as to counsel's ability to act as a zealous and effective advocate for the client, see, e.g., Groper v. Taff, 717 F.2d at 1418; Yablonski v. UMW, 448 F.2d 1175, nor a substantial possibility of an unfair advantage to the current client because of counsel's prior representation of the opposing party, cf. Williamsburg Wax Museum, 501 F.Supp. 326, or prior responsibility as a government official, see Kessenich, 684 F.2d 88. Except in cases of truly egregious misconduct likely to infect future proceedings, other means less prejudicial to the client's interest than disqualifying the counsel of her choice are ordinarily available to deal with ethical improprieties by counsel.[49] With these general considerations in mind, we proceed to an analysis of the alleged misconduct by Allis and Butler.
 
 B. The Episode Involving Allis
 
 61
 The district court found that Allis' purpose in visiting Janowski was to obtain a "retraction" of a prior statement to defense counsel that Mrs. Koller had not taken Bendectin when she claimed she did. The court recognized that Allis' conduct was at least arguably "in pursuit of protecting the interests of his clients," but concluded that it was inconsistent with a countervailing duty "to investigate whether Cynthia Koller was committing a fraud upon the court." The court cited several provisions of the Code of Professional Responsibility ("Code")--DR 2-110(B)(1) and DR 7-102(A)(3), (A)(6), and (B)(1)--without clearly finding Allis in violation of any of them.
 
 1. Standards of Conduct
 
 62
 Counsel in both criminal and civil cases frequently face situations in which there is some evidence tending to cast doubt upon the credibility of the client or the validity of the claim. Yet the adversary system is based on the premise that the truth is best ascertained in such instances through the zealous and competent presentation by each side of its strongest case. The fundamental obligation of an attorney to his client--the bedrock principle of the adversary system--does not dissolve with the appearance of unfavorable evidence or even an allegation of fraud. The attorney's duty to the client is, of course, not without limits. In the familiar words of Canon 7 of the Code, "[T]he duty of a lawyer, both to his client and to the legal system, is to represent his client zealously within the bounds of the law." EC 7-1 (emphasis added). The legal profession continually struggles to define the point at which the attorney's basic loyalty to the client must give way, for that point is very much at the heart of the adversary system.
 
 
 63
 The Disciplinary Rules of the Code cited by the district court set out standards that are designed to guide attorneys through the numerous and difficult ethical dilemmas that an advocate confronts. Thus, DR 7-102(A)(3) states that a lawyer shall not "[c]onceal or knowingly fail to disclose that which he is required by law to reveal" (emphasis added). According to DR 7-102(A)(6), "a lawyer shall not ... [p]articipate in the creation of evidence when he knows or it is obvious that the evidence is false" (emphasis added). DR 7-102(B)(1) provides that "[a] lawyer who receives information clearly establishing that ... [h]is client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same" (emphasis added). Furthermore, a lawyer is required to withdraw from representation of a client if "[h]e knows or it is obvious that his client is bringing the legal action, conducting the defense, or asserting a position in the litigation merely for the purpose of harassing or maliciously injuring any person." DR 2-110(B)(1) (emphasis added).
 
 
 64
 The Disciplinary Rules require objective and informed recognition by an attorney that specific evidence or a client's claims are fraudulent before imposing on the attorney an affirmative obligation to take actions that may be contrary to the interests of the client. An attorney faced with a potential conflict between the duty to the client and the duty not to perpetrate a fraud on the tribunal is entitled to rely on the standards of the Code of Professional Responsibility and should not be disqualified for conduct that falls within the general ambit of those provisions but does not violate the Disciplinary Rules. To permit disqualification for purported misconduct that falls short of a violation of these standards might well penalize conduct that could reasonably be deemed mandatory in fulfilling the duty to pursue zealously the interests of the client. The local rules of the district court, which define attorney misconduct primarily in terms of the Code, thus embody a conclusion that fairness and the logic of the adversary system in any event compel.
 
 2. The Propriety of Allis' Conduct
 
 65
 It appears that the district court, perhaps because of its erroneous premise that pro hac vice counsel could be more readily disqualified than regularly admitted counsel, strayed from the strict standards derived from the Code. First, the court began its discussion by stating as a general rule that "conduct which may fall short of a violation of a Disciplinary Rule of [the Code]" may warrant revocation of a pro hac vice appearance. Consistent with this premise, nothing in the opinion finds Allis guilty of a violation of the Code, but rather postulates on the basis of several disciplinary rules a general duty to initiate or foster a "true investigation" and thereby "to assist in preventing any acts of fraud upon the court." The court found Allis' effort "to obtain a retraction" from Janowski inconsistent with that general duty. Yet the court made no explicit or implicit finding that Allis did not or could not reasonably believe in the good faith of his client's claim--in particular Mrs. Koller's assertion that she took Bendectin in the first trimester--or in the truth of the "retraction" he obtained from Janowski. The court did not even incorporate or refer to the language of its preliminary Order to Show Cause, suggesting that Allis sought to obtain a retraction "without regard for [its] truth."[50]
 
 
 66
 We certainly cannot read the court's opinion as finding that Allis "knew or it was obvious" that the statement was false or that the Kollers' claim was in bad faith, or that Allis had evidence "clearly establishing" that Mrs. Koller had perpetrated a fraud on the court. In the absence of any finding--or indeed any evidence--that Allis knew or that it was obvious that Janowski's claims to him were false or his clients' case fraudulent, we can find no impropriety in his visit to Janowski for the purpose of obtaining a "retraction" of any damaging and, according to Allis' belief, false statements made to the defense.[51]
 
 
 67
 Nor can we condemn several specific aspects of Allis' conduct found objectionable by the district court. According to the district court, Allis testified "under oath that he had no intention of informing the court of the results of his 'investigation.' " Opinion at 6-7, J.A. 238-39. Allis actually testified that at the time he prepared and obtained a statement from Janowski, he had no fixed idea of how he would use it.[52] But we have found no basis in any event for the district court's implicit assumption that Allis had a duty, immediately upon discovering that his secretary may have cast aspersions on the good faith of his client's case, to bring this matter to the court's attention. Unless "he [knew] or it [was] obvious" that the Kollers' claim was fraudulent, Allis' primary duty was to investigate on behalf of his clients.
 
 
 68
 The court also criticized "Allis' failure to read the prepared statement line-by-line to Janowski to insure that she understood the contents of the statement before signing." Opinion at 7, J.A. 239. But in light of Allis' uncontradicted testimony that the substance of the statement simply put in writing what Janowski had repeated to Allis several times throughout the day and had indeed restated in the very conversation during which she read and signed the statement, we can find no fatal shortcoming in this aspect of Allis' conduct.
 
 
 69
 Furthermore, we cannot agree with the district court's conclusion that Allis acted improperly in obtaining the statement "irrespective of the erratic behavior displayed by Janowski during his visit on December 27." There was indeed ample testimony that Janowski was a flamboyant personality, that Allis believed she might have been emotionally unstable, and that, according to evidence later adduced, she had a history of mental instability and other problems. Yet we cannot find anything in Janowski's behavior that day that should have made it clear to Allis either that she did not understand what she was saying about Barnes' conduct and about the Koller case, or that what she was saying was untrue. Nor do we understand the court's cryptic reference to Janowski's "erratic behavior" as a finding to the contrary. Under these circumstances, Allis cannot be said to have acted improperly in getting a statement from Janowski affirming the gist of what she had already twice reported to him orally.
 
 
 70
 Counsel for the defendant does not even argue that Allis knew or that it was obvious that Janowski's critical claim--that she was under pressure from the defendant to sign a false statement that Koller had admitted not taking Bendectin during the first trimester--was false or that the case was a fraud. In oral argument defense counsel conceded that, given what Allis knew on December 27, it was proper, and perhaps even required by his duty to the Kollers, for him to visit Janowski and probably to take some kind of statement. Counsel claims, however, that Allis crossed the permissible line by including two "self-serving" statements that went beyond what Janowski had already told him and that were untrue: the statements that "my [i.e., Janowski's] mind is free and clear," and that Janowski was receiving no remuneration in exchange for the statement.
 
 
 71
 Although the court did not mention the "free and clear" passage, the district court's criticism of "Allis' procurement of the statement irrespective of the erratic behavior displayed by Janowski" could arguably be read as implying a finding that the "free and clear" passage was inaccurate. Counsel for the defendant argues that the statement that "my mind is free and clear" was an "indisputable falsehood." Brief for Appellee at 45. We do not, however, view it thus in the confusing context of that eventful day. The statement appears to us to resemble the simple affirmation of mental clarity routinely inserted in wills, affidavits and other documents, and cannot be said to be palpably false or misleading unless Allis "knew or it was obvious" that Janowski did not understand what she was saying, that she signed the statement under duress, or that other assertions in the substance of the statement were untrue. The district court's opinion does not come close to making any such finding, and the evidence supports Allis' characterization of Janowski's behavior as, at most, "almost inappropriately calm," relaxed and chatty that evening.[53]
 
 
 72
 The defendant points to another specific passage from the Janowski statement as an "indisputable falsehood": the statement that "I have been promised no remuneration of any kind by any representative of Butler, Jefferson, Dan & Allis for stating these true statements or for anything else." The defendant argues that this statement is false because "[a]fter the statement was signed (but before it was transmitted to the District Court), Allis agreed that a typewriter would be delivered to Ms. Janowski's apartment so that she could stay on the Butler firm's payroll without coming in to the office." In addition, defendant points to an arrangement by which Janowski's roommate "would pick up salary and vacation checks for her on Friday, December 31, 1982." Brief for Appellee at 45.
 
 
 73
 The district court, however, made no reference whatsoever in its opinion to the statement about "remuneration," nor did it make any other "finding" that could be interpreted as support for the defendant's argument on this point. As of December 27, 1982, Janowski was still an employee of the Butler firm and had recently given birth to a premature baby which was occupying much of her time. Furthermore, it is undisputed that she told Allis that she was under pressure from defendant to sign a false statement that her employer's case was a fraud. We therefore reject the defendant's contention that keeping her on the payroll temporarily in order to accommodate her role as an employee with the emotional pressures of her personal situation, and even paying her wages and fringes that were due to her for past service,[54] constituted "remuneration" for making the December 27 statement. Indeed, two expert witnesses on legal ethics testified that, given the growing suspicion that Janowski may have actually contacted opposing counsel, though perhaps only on Barnes' suggestion, Allis "probably hit on the ideal way" to handle the situation.[55] The arrangement legitimately kept her on the payroll, at least temporarily, while keeping her out of the office. We cannot accept defense counsel's condemnation of Allis' failure to fire Janowski immediately before even sorting out what had happened.
 
 
 74
 Finally, we do not find any impropriety in Allis' recording of the December 27 conversation. There is authority for the proposition that surreptitious recording generally is unethical,[56] and this court does not sanction the practice. Counsel, the client and the witness are ordinarily best protected if counsel advises the witness that the conversation is being recorded and obtains permission for the use of that recording. While Allis did not follow that procedure in this case, given the expert testimony that the use of a secret recording was proper under the peculiar circumstances Allis faced,[57] and given the questionable credibility of the individual being recorded, Allis' actions in taping his conversation with Janowski can more easily be understood to reflect a desire to get at the truth and to protect the interest of his client rather than to "thwart a true investigation." On the whole, we conclude that Allis' actions throughout the Janowski episode did not constitute misconduct and do not justify his disqualification from further representation of plaintiffs.[58]
 
 3. The Nature of the Proceedings
 
 75
 We also feel compelled to express our misgivings with the scope of the district court's inquiry into Allis' conduct; it was at once too broad and too narrow. At the outset, the court interpreted the Butler firm's limited waiver of the attorney-client privilege as to any conversations between Janowski and Mrs. Koller to extend to any discussions concerning when Mrs. Koller took Bendectin, including discussions within the firm, between the firm and other plaintiffs' counsel, and between the Kollers and their lawyers. As a result, we and the defendant are privy to the minute details of innumerable strategy meetings, telephone calls, and other conversations concerning one of the two key factual issues in the Koller case. While the court stated that it would "not tolerate a fishing expedition into the strategies of plaintiffs' attorneys in this litigation," Memorandum Opinion of Jan. 19, 1983, J.A. 139, the early stages of the inquiry seem to have come close to just that.
 
 
 76
 The court's primary justification for permitting this massive intrusion into the attorney-client and work-product privileges was the exception for fraud. Id., J.A. 141. Even if this exception could support such a sweeping abrogation of the privileges at issue, it should not have been applied in this case without first ascertaining whether there was any credible evidence that Mrs. Koller had indeed admitted to Janowski not taking Bendectin during the critical period. Without credible evidence of such a conversation--the only new "evidence" before the court--there would seem to be no basis for the extraordinarily detailed inquiry launched in January into the plaintiffs' evidence on this crucial issue in the case-in-chief. Yet the court stated in its January 19 ruling only that it could not find Janowski's charge to be "frivolous or manufactured at this time." Id. For the purpose of the evidentiary hearings into the episode, the court viewed as irrelevant the question of whether such a conversation ever took place, and the credibility of Janowski in general.[59] Indeed, at this point not even defense counsel is willing to endorse Janowski's credibility.
 
 
 77
 The extensive and detailed nature of the court's inquiry into possible improprieties of plaintiffs' counsel is especially confounding in light of the court's refusal to entertain any substantial inquiry into possible improprieties by defense counsel. This limitation on the inquiry cannot be explained simply by the pendency of a defense motion to disqualify plaintiffs' counsel, since the court stressed that the inquiry was as much on the court's own initiative as at the behest of the defense.[60]
 
 
 78
 There was evidence, some undisputed, that defense counsel had engaged in discussions about a case with a confidential secretary for opposing counsel without her employer's knowledge, had made ex parte contact with the court's law clerk on December 23, touching on at least some matters of substance,[61] had on its own obtained "independent counsel" for Janowski,[62] and was paying substantial sums of money to provide Janowski not only with counsel, but also with a comfortable apartment and other financial needs for her and her child. We are certainly in no position to ascertain whether any of these activities constituted misconduct by defense counsel. But we are left with some bewilderment over the court's one-sided approach to a peculiar episode that drew counsel on both sides into very murky waters.
 
 C. The Episode Involving Butler
 
 79
 The district court found that Butler's "release of the DERs to the media was calculated to prejudice the defendant's case and circumvent the Court's prior rulings," citing in particular "Butler's refusal of the Court's suggestion that he explain his actions during the hearings." Opinion at 8, J.A. 240. We read the court's opinion not as a per se condemnation of Butler's communication to the press of information relevant to the case; rather the court appears to have been primarily concerned with the peculiar timing and placement of the release of information so as to maximize the likelihood of potential jurors seeing it. Nevertheless, we cannot uphold the court's order disqualifying Butler for his actions.
 
 
 80
 Initially, we have some question as to the basis for the court's finding that Butler's intent was to "prejudice the defendant's case" and circumvent the court's evidentiary rulings. The court heard no live testimony on this issue; in particular it heard no testimony contradicting a plausible explanation contained in Butler's affidavit for the timing of the release--that he had not received the parents' authorizations to release the information until January. We do not believe that the court could reasonably conclude from Butler's failure to testify voluntarily that he was lying in his affidavits as to his motivation. In light of this explanation, together with Butler's amply demonstrated concern over the safety of Bendectin, the peculiar timing of Butler's release of information does not provide unambiguous support for the court's finding of bad intent.
 
 
 81
 In any event, the circumstantial evidence of Butler's intent is not dispositive; we must also look at what Butler did. The court's order treats Butler's disclosure of information ruled inadmissible in a series of routine pretrial evidentiary rulings as the equivalent of his violation of a direct prohibition on dissemination of information to the public. If Butler had released the information in the face of a protective order barring public disclosure of the DERs, we would be facing a more acute conflict between the integrity of the court's orders and the constitutional issues raised by direct restraints on the free flow of information about matters of public concern.[63] But the court issued no such order. We cannot view Butler's release to the public of information ruled inadmissible at trial as anywhere near equivalent to a violation of a court order prohibiting such conduct.
 
 
 82
 Nor is Butler's conduct covered by traditional bans against bringing inadmissible evidence directly to the attention of the jury, either inside or outside the courtroom. Thus, provisions proscribing the reference at trial to material ruled inadmissible, see DR 7-108(A), (B)(1), and those prohibiting direct extrajudicial communication with jurors, see DR 7-106(C)(1), (C)(7), are clearly inapt. Defendant invokes a "fundamental principle familiar to every trial lawyer [that] when the Court has ruled that evidence is inadmissible, counsel has a legal and ethical obligation to refrain from circumventing the Court's ruling by using circuitous means to place the evidence before the jury." See Brief for Appellee at 59. But the cases cited in support of the principle involve reference in final arguments to inadmissible evidence, and are thus similarly inapt.[64]
 
 
 83
 The defendant argues that Butler has violated the section of the District of Columbia Code of Professional Responsibility that deals directly with press comments by counsel in civil matters, a provision not, however, mentioned by the court. The District of Columbia Court of Appeals on February 14, 1975, amended the Code to eliminate the direct prohibitions on extrajudicial statements contained in DR 7-107(G) and (H). The court instead substituted Canon 20 of the American Bar Association Canons of Professional Ethics, which reads as follows:
 
 
 84
 Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally, they are to be condemned. If the extreme circumstances of a particular case justify a statement to the public, it is unprofessional to make it anonymously. An ex parte reference to the facts should not go beyond question from the records and papers on file in the court; but even in extreme cases it is better to avoid any ex parte statement.
 
 
 85
 The deliberate substitution of this general and largely precatory language for the detailed restrictions of DR 7-107(G) and (H) of the Code may well reflect serious reservations about the wisdom and even the constitutionality of the latter.[65] The Legal Ethics Committee of the District of Columbia Bar has emphasized with respect to the current D.C. version of DR 7-107(H) that it "would hesitate to interpret the Code of Professional Responsibility or the Canons of Professional Ethics in such a way as to thwart the communication of accurate factual information regarding legal proceedings to the press in the absence of a substantial threat to the due administration of justice." Formal Op. 8 (1975) (emphasis added).[66]
 
 
 86
 The Legal Ethics Committee's opinion highlights a critical element in the proper interpretation of the Code's admonition against press statements by lawyers about civil litigation--an element that is missing in this case. The court found no "substantial threat to the due administration of justice," but based its order entirely on Butler's purported intent to circumvent its ruling and prejudice the defendant's case by releasing the information. We need not decide, however, if Canon 20 requires such a showing in all cases or for all disciplinary purposes,[67] for we have already determined that disqualification is appropriate in cases of this kind only if the misconduct at issue is "likely to infect future proceedings." See supra p. 1056. In this case, the resulting article was far from inflammatory, and gave substantial space to those, including defendant, who disputed Butler's assessment of the teratogenic qualities of Bendectin. Indeed, the article quotes defendant's position on the completely independent issue of when Mrs. Koller took Bendectin--an issue of no public importance outside of the Koller case itself. The court properly observed that the conduct of Mintz was not before it,[68] but the focus on Butler's conduct alone should not have precluded any inquiry into the actual effect of his conduct on the likelihood of a fair trial. Apart from the balanced nature of the article, the prospect of prejudice was further diminished by the fact that the information was released before jurors were assigned to a particular case and thus alerted to the nature of the issues they would decide.[69] We have no basis for believing that voir dire, a process designed in part to protect against prejudicial publicity, would be inadequate to discover and remove any jurors influenced by the Mintz article.[70]
 
 
 87
 The defendant relies heavily on State v. Kavanaugh, 52 N.J. 7, 243 A.2d 225, cert. denied sub nom. Matzner v. New Jersey, 393 U.S. 924, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968), in which the court revoked the pro hac vice appearance of criminal defense counsel, F. Lee Bailey. Whether or not we were to find Kavanaugh to be persuasive authority, its facts are radically different from those before us. In that case, Bailey sent out over 150 letters to public officials, not surprisingly leaked to the press, protesting the exclusion of lie detector evidence favorable to his client, attacking as utterly corrupt the entire conduct of the proceeding, and calling for executive intervention to halt the prosecution. Even in the face of such extreme statements by counsel, the court in Kavanaugh, unlike the district court here, revoked Bailey's appearance only after reluctantly concluding that there was no evidence that "Bailey would stay in bounds" in the future, and that subsequent disciplinary proceedings would be inadequate to protect the integrity of the judicial process. 243 A.2d at 231.
 
 
 88
 This case is very different. While Butler's decision to release the DERs to the press precisely when he did is not to be applauded, we do not believe that this record could support a finding that his conduct was likely to infect future proceedings. Under these circumstances, we cannot approve his disqualification, with the attendant prejudice to his clients, on the basis of this episode.
 
 IV. CONCLUSION
 
 89
 We conclude that the district court applied an erroneous legal standard in evaluating whether Allis and Butler had engaged in misconduct warranting revocation of their pro hac vice appearances. Viewed under the appropriate standards, the conduct of neither Allis nor Butler justifies the court's order revoking their appearances and disqualifying their law firm. We therefore reverse the decision of the district court and remand for reinstatement of the appearances of Allis and Butler on behalf of plaintiffs.
 
 
 90
 The plaintiffs have requested that we direct the district court to assign this case to another judge for future proceedings. See Brief for Appellants at 57. We recognize that these disqualification proceedings, culminating in what we have determined to be erroneous findings of misconduct against plaintiffs' counsel, have sorely tried the relationship between the court and plaintiffs' counsel. If the district court judge believes that it will be difficult after these events for her to act with complete impartiality in future proceedings vis-a-vis Allis and Butler, we are confident that she will recuse herself. Otherwise we decline to prejudge her ability to preside with equanimity over a fair trial on the merits of the Kollers' claims. We add only a few words about the disciplinary proceedings reviewed here.
 
 
 91
 In December, 1982, when this episode began, trial was scheduled to begin within weeks. Trial has still not begun. In the course of these disqualification proceedings, the court and counsel have probed the inner workings of the plaintiffs' counsel's law firms, shattering counsel's work-product privilege and plaintiffs' attorney-client privilege. The inquiry shifted focus several times, appearing at one point to be an investigation of the plaintiffs and of one of the core issues in their lawsuit, at another time of the bizarre activities and motives of the "double agent" informer, and finally of plaintiffs' counsel.
 
 
 92
 The disruption and delay of proceedings on the merits, such as we have seen in this case, are unhappily foreseeable byproducts of the injudicious use of disqualification motions by opposing counsel. We fear the intrusive potential of such motions would be exacerbated were orders disqualifying counsel not immediately appealable. In complex, costly product liability cases of this type, the plaintiff may have no realistic or comparable alternative to current counsel; counsel are not fungible. To the degree that the credibility of potential witnesses such as was involved in this case can and will be tested in the course of the case in chief, there is little justification for a protracted preview of the evidence through disqualification proceedings. As for questionable activities on the part of trial counsel, at least where those activities do not clearly violate a disciplinary rule and taint future proceedings, they should be remediable by admonitions, protective orders, or even, if necessary, by post-trial contempt without needlessly delaying proceedings on the merits and depriving a party of its chosen counsel.[71] We hope that the profoundly disturbing episode chronicled in this case serves to make trial courts and counsel aware of the importance of not allowing dubious and exaggerated attacks on counsel to derail civil proceedings.
 
 
 93
 Reversed and remanded.
 
 
 94
 CHARLES R. RICHEY, District Judge (concurring):
 
 
 95
 With some reservation, I reluctantly concur in Judge Wald's opinion but am now writing to clarify my differences with the majority without in any way intending to reflect adversely upon my two colleagues or the sincerity of their views. I am just compelled to express my views separately on two issues of crucial importance in this and future cases. I address them seriatim.
 
 
 96
 THE TRIAL JUDGE SHOULD BE DIRECTED TO CONDUCT A PROMPT
 
 
 97
 HEARING PRIOR TO TRIAL BECAUSE IT MAY BE NECESSARY
 
 FOR COUNSEL TO APPEAR AS A WITNESS
 
 98
 One of the crucial factual issues to be decided at the trial of this case will be whether Mrs. Koller actually took Bendectin during the critical period; that is, during the first trimester of her pregnancy. The importance of this issue is evidenced by the zealous efforts of counsel for all parties to obtain statements and/or retractions from Janowski, who claimed that Koller had admitted not taking the drug during the critical period. Unfortunately, however, zealous efforts can often lead to the possibility that a lawyer will be called as a witness. In this case, given the active role that counsel for both sides have taken in gaining statements from Janowski, and given the apparent inconsistency of some of those statements, there is a strong possibility that a lawyer from either side, or both, will be called to testify. The lawyers may have to testify concerning their actions in communicating with Janowski or other matters, or even to impeach her credibility. When the potential for unfair surprise and prejudice to either side is so great, it is the responsibility of this Court to sua sponte raise the issue and give the trial court specific direction on how to resolve the problem.
 
 
 99
 The public interest demands an efficient use of judicial resources towards the "just, speedy and inexpensive" remedy spoken for in Rule 1 of the Federal Rules of Civil Procedure. Towards that end, "courts should sua sponte raise ethical problems involving danger to a just, speedy and inexpensive remedy, even if the parties do not." General Mill Supply Co. v. SCA Services, Inc., 697 F.2d 704, 711-12 (6th Cir.1982); Moyer v. 1330 Nineteenth Street Corp., 583 F.Supp. 1580 (D.D.C.1984). Here the danger is a large probability. Defense counsel may choose to call Allis to try and show that he obtained the retraction from Janowski in a misleading or unfair manner. Plaintiff's counsel may decide to call a member of the defense law firm to try and show that Janowski's original claim that Koller was not telling the truth, was induced by financial or other incentives or threats. In addition, there exists the potential that a lawyer on either side will need to be called to support their own client's position. For example, Allis may need to testify concerning what Janowski told him during his visit to obtain the retraction.
 
 
 100
 Attorneys appearing before this Court and the District Court are governed by the Code of Professional Responsibility adopted by the District of Columbia Court of Appeals. Local Rule 4-3(IV)(b): DR 5-102(A) provides that a "lawyer ... shall withdraw from the conduct of the trial and his firm, if any, shall not contine in the representation in the trial" if he knows or it is obvious that he ought to be called as a witness on his client's behalf. In addition, DR 5-102(B) provides that when "a lawyer learns or it is obvious that he ... may be called as a witness other than on behalf of his client" he may continue representation only until it is apparent that his testimony may be prejudicial to his client. Ethical Consideration 5-9 notes that "[t]he roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state the facts objectively." In such situations where the lawyer is called to testify, as this Court has recognized, the "case would be presented through the testimony of an obviously interested witness who is subject to impeachment on that account ...". Groper v. Taff, 717 F.2d 1415, 1418 (D.C.Cir.1983). As such, the lawyer is put "in the unseemly position of arguing his own credibility". Id. When an attorney is forced to argue his own credibility, the effects are disastrous. Such testimony has high prejudicial impact which is unlikely to be outweighed by its probative value. Fed.R.Evid. 403. The magnitude of the problem is ably discussed in General Mill Supply Co. v. SCA Supply Services, Inc., 697 F.2d 704, 712 (6th Cir.1982):
 
 
 101
 The experience of the bar and its collective voice in the ABA Canons demands the separation of the roles of advocate and witness. Experience shows that one who combines both roles is not likely to be, as an officer of the court, helpful to the court. There is always danger that when he speaks he will forget whether he speaks as advocate or counsel, to the likely confusion of proceedings, as well as their embitterment. Experience teaches that embitterment between counsel does not conduce to just and speedy proceedings. Such embitterment is likely to occur when one counsel undertakes to impeach the credibility of opposing counsel in his capacity of witness.
 
 
 102
 See also Moyer v. 1330 Nineteenth Street Corp., 583 F.Supp. 1580 (D.D.C.1984).
 
 
 103
 Although the parties have not raised this issue in their pleadings or in oral argument, as previously stated, in such a case where the potential for conflict is so strong, I believe that the duty of this Court is no less than the trial judge to see that the matter is ventilated at the earliest practicable moment prior to trial. While it is not the role of this Court at this stage to make factual or legal determinations on this issue, I would advocate the exercise of this Court's inherent power as supervisor of the administration of justice in remanding the case to give specific instructions to hold a pre-trial hearing on this issue. Counsel for both sides have peculiar knowledge that relates to crucial facts in dispute in this case. In order to avoid the possibility of a mistrial and a waste of judicial resources that could result if this issue is not resolved prior to trial, the trial judge should make prompt inquiry into this matter by holding a hearing without delay upon remand.
 
 
 104
 The importance of avoiding problems by conscientious and thorough pre-trial proceedings by the trial judge is reflected in the recent amendments to Fed.R.Civ.P. 16, effective August 1, 1983. Rule 16 now provides for greater judicial management of cases prior to the start of trial in order to see that the case is "disposed of ... more efficiently and with less cost and delay...." Advisory Committee Note to 1983 Amendment. The rule specifically calls for the trial court judge, in the exercise of his or her discretion, to hold a pre-trial conference where many subjects may be discussed, including "such other matters as may aid in the disposition of the action." Fed.R.Civ.P. 16(c)(11). The importance of pre-trial procedures is also evidenced by the words of Judge Laws, the late Chief Judge of the United States District Court for the District of Columbia:
 
 
 105
 One of the vital, if not outstanding, advantages of pretrial procedure is to take the trial cases out of the realm of surprise and maneuvering, whereby an unwary counsel might see the just case of his client lost.
 
 
 106
 Laws, Pre-Trial Procedure, 1 F.R.D. 397, 399 (1940).
 
 
 107
 In the case before the Court today, if the trial judge were not to make prompt and efficient inquiry on remand, the potential for unfair surprise is great. In addition, if unresolved problems arise at trial for the first time, the potential for incurable prejudice, resulting in a mistrial, is quite high. Absent comprehensive pretrial procedures, trial judges may be forced to hold complex hearings on issues unrelated to the merits of an action in the middle of trial. It would indeed be unfortunate if the trial judge in this case on remand, were forced to hold a hearing on this crucial ethical question and voir dire the witnesses and lawyers in the middle of trial. Such action would result in undue delay of the trial, added expense to the witnesses, counsel and the parties, and added uncomfort and anxiety to a jury panel that will have to sit and wait while these issues are ironed out. This result would be inconsistent with the duty of the trial court to conduct the trial in the most economical and efficient manner. See Fed.R.Civ.P. 1, 16.
 
 
 108
 The first question the trial judge must resolve is whether counsel intend to call their legal adversaries as witnesses or whether the lawyers should testify on their respective clients' behalf. If counsel represent that such situations will not occur, that may end the matter. If counsel represent, however, that the potential does exist, the trial judge should immediately convene a hearing to address the issues and make appropriate findings with respect to this matter. Judge Wald seems to suggest that ethical violations, and perhaps other matters should be dealt with by "admonitions, protective orders, or even, if necessary, by post-trial contempt orders without needlessly delaying proceedings on the merits." Such advice in this instance, however, appears to ignore the obvious practical problems that a trial judge faces when trying a case. The question remains "how does a judge try a case most effectively and fairly to all parties involved?". The answer lies in thorough and comprehensive pre-trial procedures that resolve in advance, all of the problems that may be reasonably anticipated or expected to arise at the trial. This is the purpose of Motions in Limine and Fed.R.Civ.P. 16. By promptly resolving such problems, the trial court will be securing the highest quality of justice, in the least amount of time, and at the lowest possible cost to the parties.
 
 
 109
 EVEN THE SUGGESTION OF REMANDING THIS CASE TO ANOTHER JUDGE
 
 IS INAPPROPRIATE
 
 110
 My second concern with Judge Wald's opinion stems from the implicit allegations made against the trial judge in this case concerning her alleged "one-sided approach" to the case. After a thorough review of the record, I can conclude no more than that she has erred in disqualifying Allis and Butler on the grounds set forth in the majority opinion. I cannot join in such direct or indirect criticism of the competence and fairness of the trial judge. I concur, wholeheartedly, however, with this panel's decision not to directly remand the case to another judge and desire to express my views more fully because of the potential for havoc such a remand policy would generate upon the effective administration of justice in the trial court.
 
 
 111
 While appellate courts do have authority to reassign cases on remand "to avoid even the appearance of bias," see Calvaresi v. United States, 348 U.S. 961, 75 S.Ct. 522, 99 L.Ed. 749 (1955); Lewis v. Curtis, 671 F.2d 779, 789 (3d Cir.1982), cert. denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982), "such mandatory reassignments should be made infrequently and with the greatest reluctance." Nobel v. Morchesky, 697 F.2d 97, 103 n. 11 (3d Cir.1982). "Remand to a different judge is not the usual remedy when error is found in District Court proceedings. Remand to a new judge is reserved for unusual circumstances." United States v. Arnett, 628 F.2d 1162, 1165 (9th Cir.1979); see also United States v. Medina-Cervantes, 690 F.2d 715, 717 (9th Cir.1982). Without specific and objective evidence that a trial judge, acting in his or her judicial capacity, will be unable to fairly follow the mandates of this Court and apply them in a fair and impartial manner, a remand to another judge, or a direct or indirect suggestion for such action is totally inappropriate in my view. Some courts have declined to remand cases to another judge on the implicit rationale that judges are presumed to be able to act fairly. See e.g., Spivey v. Zant, 683 F.2d 881, 886 (5th Cir.1982) ("We are confident that the District Judge ... is capable of according Spivey the fair hearing to which he is entitled."); Zweibon v. Mitchell, 606 F.2d 1172, 1182 n. 57 (D.C.Cir.1979), cert. denied, 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981), rehearing denied, 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1024 (1981). Certainly, based upon the record, such is the case here. To hold otherwise is to engage in sheer speculation, conjecture and surmise which would be improper.
 
 
 112
 In Zweibon v. Mitchell, 606 F.2d at 1182 n. 57, this Court recognized that a trial judge should be deemed capable of carrying out his or her judicial obligations:
 
 
 113
 We decline appellant's invitation to assign this case to a different judge on remand. We are confident that the District Judge will follow this court's rulings and will faithfully discharge his judicial obligations.
 
 
 114
 Even when this Court has found that a trial judge was "disposed against" a party's claim, it declined to mandate reassignment to another judge. The Court left that decision to the discretion of the District Court under its rules, and the presumption that the trial judge would recuse himself if grounds for such an action existed. See United States v. Barnes, 662 F.2d 777, 783 (D.C.Cir.1980).
 
 
 115
 The situations in which reassignment has been mandated by this Court are very distinguishable from the case at bar. In Naples v. United States, 307 F.2d 618 (D.C.Cir.1962) (en banc), a case was remanded to a different judge when there existed an "unmistakable" conclusion that the trial judge's opinion largely reflected the "personal views of the author", the judge had not cited the relevant precedent in the Circuit, and when the judge re-appointed counsel for a defendant when the lawyer refused to pursue a procedural course of action suggested by the judge. Id. at 629-30. Even in that case, however, three judges wrote separately to disagree with the decision to remand the case to a different judge. The late Circuit Judge Bastian wrote:
 
 
 116
 Our principal purpose here is to dissociate ourselves from the ruling of the majority that, upon remand, the case must be tried before a different judge. We consider this a reflection on a distinguished member of the District Court whose ability and integrity are well known. We think a reading of the judge's opinion indicates the meticulous care and attention which he gave to this case. There is no reason to believe that the District Judge would not follow the rules laid down by this court in its majority opinion.
 
 
 117
 Id. at 631-32. In Bishop v. United States, 349 F.2d 220 (D.C.Cir.1965), cert. denied, 393 U.S. 870, 89 S.Ct. 158, 21 L.Ed.2d 139 (1968), a remand to another judge was found to be appropriate when the trial judge had shown "such disregard" for procedures designed to test the validity of a criminal plea, that an "impartial inquiry" was needed. Id. at 221.
 
 
 118
 In the case before the Court today, I can find no actions by the trial court judge that rise to such a level justifying a remand to another judge. Her opinion and comments during hearings represent fair comment on the evidence introduced before her in open court which the standardized jury instructions for the District Court assert is appropriate and proper. See Standardized Civil Jury Instruction for the District of Columbia, No. 1-6 (1981). Counsel for appellants in this case seek to "end-run" the tough standards for recusal of judges mandated by Congress in 28 U.S.C. Secs. 144 and 455. Such statutes are consistently construed strictly to safeguard the judiciary from frivolous and unwarranted attacks upon its dignity and integrity, to prevent abuse and to insure the orderly functioning of the judicial system. See e.g., Rademacher v. City of Phoenix, 442 F.Supp. 27, 29 (D.Ariz.1977); Town of East Haven v. Eastern Airlines, Inc., 304 F.Supp. 1223 (D.Conn.1969). In addition, the law is clear that bias and prejudice acquired by the Court in its judicial capacity, or indicated by in-court comments prompted by developments in the case or prior legal proceedings, cannot be the basis for recusal. United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); In re International Business Machines Corp., 618 F.2d 923, 929 (2d Cir.1980) (Bias must be extrajudicial and not based upon in-court rulings.); United States v. Haldeman, 559 F.2d 31, 133 (D.C.Cir.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); United States v. Patrick, 542 F.2d 381, 390 (7th Cir.1976), cert denied, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); Wolfson v. Palmieri, 396 F.2d 121, 124 (2d Cir.1968). Counsel for appellants have not shown any facts raising a colorable claim that the trial judge should have recused herself and did not raise this issue on appeal. There is simply no evidence that the experienced trial judge in this case will be unable to continue to preside over the trial, on remand, with her usual competence, impartiality and good judgment based upon her outstanding record of thirteen years of trial judge experience and her experience in the Corporation Counsel's Office and the Department of Justice. Based upon long experience as a litigator and as a trial judge, I cannot sanction the use of requests to remand appellate cases to different judges. The time has come to implement the mandate of Congress and remand cases to a different trial judge only on the basis of evidence that would require recusal under 28 U.S.C. Secs. 144 and 455. Otherwise, we will be opening a "Pandora's Box" for countless baseless attacks upon a defenseless judiciary whose independence is essential to the preservation of this republic.
 
 
 119
 To encourage requests for remands to another judge, would also be encouraging indirect judge shopping, and libelous or slanderous statements directed against both trial and appellate judges. In addition, remands by an appellate court to different judges cause a waste of valuable judicial resources particularly in a case such as this where the trial judge has become familiar with the facts and issues of a case. This factor has been considered by a number of courts and is particularly relevant when the case is a complex one. See United States v. Robin, 553 F.2d 8, 10 (2d Cir.1977) (en banc); United States v. Medina-Cervantes, 690 F.2d 715, 717 (9th Cir.1982). Such a remand by an appellate court is also an unnecessary disparagement of the trial judge's reputation at the bar and may even contribute to the loss of collegiality and her effectiveness. For these reasons, I agree with my colleagues' decision not to accept appellant's suggestion to remand to another judge but would omit any implicit suggestion of the possibility of recusal. Such suggestions will only encourage requests for a remand to a different judge on frivolous grounds in the future. The Court's function is to discourage such a practice except in the most egregious case.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 Koller v. Richardson-Merrell Inc., Civil No. 80-1258 (D.D.C. Jan. 6, 1984). All orders, memorandum opinions, hearings, depositions and affidavits in this docket are hereinafter cited only by date and by page number in the Joint Appendix (J.A.). Other items of record are cited to the Joint Appendix only
 
 
 [2]
 Notice of Appeal was filed on January 19, 1984, by counsel for Butler, Allis and the Butler law firm. J.A. 242. The plaintiffs below are listed as parties to the appeal in Brief for Appellant at 2
 
 
 [3]
 Defendant Richardson-Merrell is now a subsidiary of the Dow Chemical Co., and is known as Merrell-Dow Pharmaceuticals, Inc. See Brief for Appellee at i
 
 
 [4]
 Butler was admitted pro hac vice pursuant to an appearance entered on January 26, 1981. J.A. 102. Allis was permitted to appear, apparently pro hac vice, see infra p. 1054 & n. 45, as a member of the Butler firm and a member of the bar of the District Court for the District of Columbia. See Hearing of Oct. 13, 1982, J.A. 561-62. Any subtle distinctions between their status have no significance in this case. See infra pp. 1054-1055
 
 
 [5]
 The plaintiffs appear to acknowledge that, even assuming Bendectin is a teratogen, Mrs. Koller must have taken the drug during the first 40 days of pregnancy--the period in which the fetus' limbs form--in order for Bendectin to have caused the particular limb malformations Anne Koller was born with. See Hearing of Feb. 10, 1983 (Allis), J.A. 603-04
 
 
 [6]
 Reviewing the facts of this episode is no simple matter. First, the court's "findings" are limited to what we can glean from its one-paragraph summary of the episode. For details, we are forced to sift from the record, with the guidance of counsel's briefs and oral arguments, the more or less undisputed facts. Second, the status of the testimony of Janowski herself, who in part corroborated and in part contradicted plaintiffs' witnesses, is very ambiguous. See infra pp. 1045-1046
 
 
 [7]
 See Affidavit of Richard Daum, June 5, 1983, J.A. 316-18; Hearing of Mar. 10, 1983 (Allis), J.A. 657-61
 
 
 [8]
 See Hearing of Mar. 10, 1983 (Allis), J.A. 671-75, 684, 692-95
 
 
 [9]
 See, e.g., id., J.A. 674-77, 692-93; Hearing of Mar. 15, 1983 (Allis), J.A. 816-17. The defendant does not dispute the essential points of Allis' testimony about his conversation with Janowski, although counsel said in oral argument that Janowski "dissembled" in making these statements to Allis
 
 
 [10]
 See Hearing of Mar. 10, 1983 (Allis), J.A. 671-73, 704
 
 
 [11]
 The record contains two versions of the transcript--one submitted by each party--which vary in inconsequential ways. Both parties have referred to defendant's version, appearing at J.A. 1467-1500; we do so as well
 
 
 [12]
 This is a summary of the transcript: Allis, Humphries, and Janowski discussed briefly the health of Janowski's baby, arrangements for getting her paycheck and vacation pay later that week, and Janowski's hostility toward the firm and dissatisfaction with her job and salary. J.A. 1469-76. Janowski then began to talk about feeling harassed by Barnes, who had been coming to see her at the hospital and her house--"[r]ound the clock harassment." Janowski continued, "Well some of the conversation going around about money is, you know, very lucrative. And I'm thinking to myself, Jesus Christ, you know, this is not my fight." J.A. 1477. Humphries interjected, saying he had seen such pressure before and he sympathized with her. Janowski went on about Barnes:
 "You know, some of the things he pulled trying to ingratiate himself backfired. Like he'll walk around here and he'll say Jesus, look how you live [ ]. My God, bring a little baby to this. You know they don't take care of you. And we'll--we'll right all these wrongs .... We'll find a beautiful apartment for you."
 J.A. 1479-80. Humphries ("F.H.") then asked, "Honestly, does he still have any reasons to feel this--this idea that somehow ah you know or you said that Mrs. Koller talked to you?" Janowski ("K.J.") replied,
 K.J. No, he wants me ... he will bet on somebody to say it. They don't give a hoot .... They want someone to recall a conversation with Mrs. Koller that she never took Bendectin during that first trimester you know, that she may have taken aspirin, or whatever the hell. I don't know. I wasn't involved then. But they have a transcript of the alleged conversation that they want. You know. "Do you remember? Think about a little more of the conversation." That type of thing.
 F.H. Well what do you think about that--that they say they have some transcript.
 K.J. Well, that's criminal fraud. I mean if somebody actually said that ...
 F.H. Did you ever talk to Mrs. Koller?
 K.J. Well I've talked to her, but only, you know, to ask her if she wanted coffee and oh, you know, get her on the telephone for Nick Allis ....
 F.H. Did she have ... Did she ever mention to you anything about the pill or the Bendectin?
 J.A. 1480-81.
 K.J. I have no trouble with making a statement to that affect [sic] you know. The only contact I would've had with Mrs. Koller, personal contacts. They don't even know about is because it never came up in the conversation. I had sent her a book called "How to Raise a Retarded Child," and said look, I had a little girl once and this book was tremendously interesting to me.
 ....
 And I specifically didn't mention that to them because they said to me, you know, what's been the extent of relationship with Mrs. Koller ...? I specifically didn't mention that because then they'd jump up and say ah haa--she was a personal friend of yours and may have confided in you.
 J.A. 1488. (The above excerpt appears on a page of the transcript that is out of sequence in the appendix.) Janowski then returned to the subject of harassment by Barnes. She indicated that she might talk to the lawyer "they" had arranged for her to talk to and ask him to "get some kind of restraining order so that nobody comes to see me or at least don't come to see me at the hospital. And so I can get my paycheck and go away. I want to go far away--go to Chicago, go to Mexico, you know." J.A. 1482. Humphries left on a pretext in order to change the tape and returned.
 After more discussion about the harassment, Humphries said, "I think the one way that you are going to keep these guys from pestering you and bothering you is to declare once and for all in the clearest, simplest way, that you did not hear Mrs. Koller ever say that she didn't take Bendectin." Janowski repeated, "I have never had any conversation with Mrs. Koller--other than would you like some coffee." J.A. 1490. Humphries stressed that the harassment would probably continue unless she made a statement "saying that what they're trying to put into your mouth isn't true, you know."
 K.J. ... I have no quarrel with that, you know--bring me or send me such a statement or pull it out of your jacket pocket by coincidence--I have no problem.
 ....
 F.H. Pull it out Nick [Humphries chuckling] By golly, it just so happens ...
 K.J. This saves me the trouble of typing one myself.
 ....
 K.J. ... I have to cross something out to look like I did something.
 F.H. That's right! You understand ....
 J.A. 1493-94. As she was reading the statement, Janowski noted a spelling error and made several comments: "This is true. They've been making tremendous promises about relocating me within twenty-four hours and make it sound, it sounds to me like a ... a plane would be chartered to fly me away that would ... to sunny climes, or whatever. Really, it's been quite flattering. I've never had such attention." "It would have been fun to see what they were willing to pay for that statement. I mean, just for the hell of it!" J.A. 1495.
 After more discussion about her dissatisfaction at work and the pressures she had been under, Janowski inquired, "This is not relating to any ah ... remuneration. But I would like them to have my check and my paycheck for Luis on Friday. It's pretty important to me." Allis agreed. She then stated, "These people aren't going to stop at this. They're going to go to try to find somebody else ... You think it makes any difference to them who they get." The tape ends at that point.
 
 
 [13]
 The handwritten statement reads as follows:
 Are You OK?
 ... I'm just worried--
 You're worried about all these tests?
 No, I'm worried about the trial.
 Are you afraid it'll be called off again?
 No, I'm worried about the experts. Maybe they won't be able to convince the jury that Bendectin is a teratogen.
 I don't think that's a problem. Our problem is going to be convincing the jury that you took Bendectin during the first trimester when we know--and you know--that you didn't.
 Jim Butler says he can convince the jury it's midnight, even if they can see the sun shining through the courtroom windows.
 Janowski then drew a line and wrote, "The above 'conversation' is the one they want me to 'recall' having," and signed the statement. J.A. 1505.
 
 
 [14]
 See Hearing of Mar. 15, 1982 (Allis), J.A. 849-50
 
 
 [15]
 The letter appears at J.A. 1461-62
 
 
 [16]
 Although the letter did not identify this "independent counsel," it was Carl Schuck, a member of the Los Angeles firm of Overton, Lyman & Prince. As the transcript of the December 27 conversation shows, supra note 11, Janowski made some mention of Schuck to Allis earlier in the day. According to Richard Daum, the paralegal with whom Janowski first spoke on December 26, she denied that Schuck was acting as her lawyer and talked about him as another of the representatives of defendant and "part of their efforts to have her sign a statement which she believed to be false." Affidavit of Daum, Jan. 5, 1983, J.A. 317-18. Allis testified that it was not until he received the Davis Polk letter on December 28 mentioning "independent counsel" that it occurred to him that Janowski might be in some way represented by Schuck. Hearing of Mar. 15, 1983 (Allis), J.A. 843-44. Plaintiffs dispute Schuck's independence. See infra note 62
 
 
 [17]
 The letter appears at J.A. 1501-03
 
 
 [18]
 On December 27, Janowski called Carol Freeman, a close friend who worked at a law firm in Houston, and told her that an investigator for the defense in the Koller case wanted her to remember a telephone conversation that never took place, and offered her $15,000 to testify to the conversation. Affidavit of Carol Freeman, Jan. 17, 1983, J.A. 321. According to Allis, Freeman communicated this information to Richard Daum on the same day. Hearing of Mar. 10, 1983 (Allis), J.A. 668-69
 
 
 [19]
 Schuck's letter appears at J.A. 1511-12
 
 
 [20]
 These depositions were conducted before a Special Master in Los Angeles
 
 
 [21]
 These additional depositions were ordered at a hearing on Jan. 18, 1983. See J.A. 582-84
 
 
 [22]
 The Special Master initially issued this ruling as to the Janowski deposition. The ruling was appealed by plaintiffs. In its Order and Memorandum Opinion of Jan. 19, 1983, J.A. 137, the court upheld the ruling and extended it to all future depositions and testimony on the issue
 
 
 [23]
 Deposition of Janowski, Jan. 12, 1983, J.A. 4444-47
 
 
 [24]
 Id., J.A. 4534-36
 
 
 [25]
 Id., J.A. 4556-68
 
 
 [26]
 Id., J.A. 4572-91
 
 
 [27]
 See Hearing of Jan. 31, 1983 (Butler), J.A. 596-11 to 596-29 (summarizing impeachment evidence). Although the defendant disputes some of this impeachment evidence, it does not put her forward as a credible witness and it argued to the district court that her credibility was not at issue. Furthermore, the district court viewed as irrelevant Janowski's credibility in general and, in particular, the truth of her assertion that she heard Mrs. Koller admit not taking Bendectin; the court does not appear to have relied on Janowski's testimony in its analysis. See, e.g., Hearing of Mar. 2, 1983, J.A. 621; Hearing of Mar. 7, 1983, J.A. 635, 640, 644. Therefore, although Janowski's testimony is part of the record and would ordinarily seem critical, for the above reasons we give it little weight
 
 
 [28]
 See Deposition of Janowski, Jan. 27, 1983, Statement of Schuck, J.A. 1109-13. Defendant contends that Schuck alone determined that the expenses were necessary for Janowski's protection, and that the cost of counsel, the security apartment and other expenses would willingly have been shared if plaintiffs' counsel were so inclined. Plaintiffs dispute these contentions. We express no view as to the propriety of defendant's conduct in this regard. See infra pp. 1060-61
 
 
 [29]
 At a hearing on March 2, the court said: "As far as the merits of Mrs. Koller's case was concerned, Ms. Janowski's testimony can be totally disregarded by the jury. Only the jury can make a determination of whether she's telling the truth or not." J.A. 626
 
 
 [30]
 At the March 2 hearing the court stated that its "major concern" was "what counsel did with respect to Ms. Janowski once it became clear that she had started talking, and excuse the vernacular, out of school." J.A. 627. See also Hearing of Mar. 7, 1983, J.A. 630-35
 
 
 [31]
 See, e.g., Hearing of Mar. 10, 1983 (Allis), J.A. 685-87, 692-94, 700-02
 
 
 [32]
 See id., J.A. 706-07
 
 
 [33]
 See, e.g., id., J.A. 674-77, 683
 
 
 [34]
 There was some dispute in the testimony concerning precisely when various members of the firm, especially Allis, learned--and not merely suspected or inferred--that Janowski had told the defense that Mrs. Koller had not taken Bendectin in the first trimester. The dispute does not appear to us to be either clearcut--there is no direct testimony that Allis actually knew of such a statement to the defense--or critical. Allis himself testified, first, that he believed at the time he obtained her statement that Janowski had probably indicated something to the defense to the effect that the case was fraudulent, and second, that one purpose behind the statement was to get a truthful retraction of any such prior false statement. It was Allis' intent that the court viewed as critical
 
 
 [35]
 See, e.g., Hearing of Mar. 10, 1983 (Allis), J.A. 753
 
 
 [36]
 See supra note 3
 
 
 [37]
 Koller v. Richardson-Merrell Inc., No. 84-5039 (D.C.Cir. Jan. 27, 1984), J.A. 243
 
 
 [38]
 See, e.g., Greitzer & Locks v. Johns-Manville Corp., 710 F.2d 127 (4th Cir.), cert. denied, 459 U.S. 1010, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982); General Mill Supply Co. v. SCA Serv., Inc., 697 F.2d 704, 706 (6th Cir.1982); Gough v. Perkowski, 694 F.2d 1140, 1141-45 (9th Cir.1982); Norton v. Tallahassee Memorial Hospital, 689 F.2d 938, 941 (11th Cir.1982), reh'g denied, 700 F.2d 617 (11th Cir.1983); Freeman v. Chicago Musical Instrument Co., 689 F.2d 715, 717-21 (7th Cir.1982); Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 n. 2 (2d Cir.1981); Duncan v. Merrill Lynch, Pierce, Fenner & Smith, 646 F.2d 1020, 1026-27 (5th Cir.), cert. denied, 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981)
 
 
 [39]
 The Court thus overruled numerous contrary decisions of the courts of appeals. See Flanagan, 104 S.Ct. at 1053 n. 2, and cases cited, but see United States v. Greger, 657 F.2d 1109, 1110-13 (9th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 1891, 77 L.Ed.2d 281 (1983) (disqualification order in criminal case not immediately appealable)
 
 
 [40]
 The collateral order doctrine has thus far been interpreted to permit interlocutory appeals in criminal cases only in three narrow circumstances: an order denying a motion to reduce bail, Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 1 (1951), which would become moot on conviction, and orders denying motions to dismiss an indictment on grounds of double jeopardy, Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), or the speech or debate clause, Helstoski v. Meanor, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979), both of which guarantee the right not to be tried at all. See Flanagan, 104 S.Ct. at 1055
 
 
 [41]
 See, e.g., Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) (order allocating expenses of identifying class members); McSurely v. McClellan, 697 F.2d 309, 315-16 (D.C.Cir.1982) (order denying government officials absolute or qualified immunity); Story v. Robinson, 689 F.2d 1176 (3d Cir.1982) (order allocating costs of transporting plaintiff prisoners to court appearances); United States v. CBS, Inc., 666 F.2d 364 (9th Cir.), cert. denied sub nom. CBS, Inc. v. Columbia Pictures Indust., 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1329 (1982) (order denying motion of non-party witness for reimbursement of costs incurred in supplying subpoenaed documents); United States v. AT & T, 642 F.2d 1285, 1295-96 (D.C.Cir.1980) (discovery order where compliance would allegedly violate work product privilege)
 
 
 [42]
 Of course, we do not imply that, in case a showing of prejudice were necessary, a criminal defendant would have to show that the quality of substitute counsel's representation fell below the constitutionally minimum standard for effective assistance of counsel in criminal cases. We suggest only that appellate courts have considerable experience--not duplicated in civil cases--in evaluating whether shortcomings in the representation of a criminal defendant require reversal of a conviction
 
 
 [43]
 We do not place too much significance on this fact, since most such orders have probably been appealed and reviewed before judgment, as in the case before us
 
 
 [44]
 Although the standard of review in Groper, in which the critical issue was factual, was abuse of discretion, we indicated that "a less deferential standard of review may be appropriate when ... only a purely legal question is at issue." 717 F.2d at 1418 n. 4
 
 
 [45]
 Local Rule 1-4(a)(1) of the U.S.Dist.Ct. for D.C
 
 
 [46]
 Local Rule 4-3 (VII) provides that attorneys admitted pro hac vice are, like regularly admitted attorneys, subject to the disciplinary jurisdiction of the court. Rule 4-3 (IV), see infra p. 1055, sets out general "Standards for Professional Conduct" for "any attorney admitted to practice before this court," and draws no distinction between local counsel and specially admitted counsel
 
 
 [47]
 We recognize that this is dictum; neither Cooper v. Hutchinson nor the Third Circuit's later case, Johnson v. Trueblood, 629 F.2d 302 (3d Cir.1980), resolved the question of what substantive standards were to be applied in determining whether to revoke an attorney's pro hac vice appearance; each dealt instead with the procedural aspects of such an action
 
 
 [48]
 Defense counsel relies on Laughlin v. Eicher, 145 F.2d 700, 702 (D.C.Cir.1944), cert. denied, 325 U.S. 866, 65 S.Ct. 1403, 89 L.Ed. 1985 (1945) and Viereck v. United States, 130 F.2d 945, 961-62 (D.C.Cir.1942), rev'd on other grounds, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943), for the proposition that this court has not heretofore imposed strict limitations on the power of the district court to disqualify counsel. Laughlin concerned the disqualification of defense counsel in a sedition trial after counsel filed an impeachment petition against the judge and made statements in court and in the petition that this court characterized as "highly derogatory," "fantastic," and "a public profession of contempt for [the judge's] character." 145 F.2d at 702. The case is, in short, highly exceptional and does not affect our conclusion here that disqualification is rarely warranted in cases not falling into the pattern delineated in text. In Viereck, the district court "ejected" defense counsel summarily on the basis of counsel's statement, after a ruling foreclosing certain testimony, that the court was "biased in favor of the Government and prejudiced against this defendant." 130 F.2d at 961. Our decision over 40 years ago approving the court's summary disqualification as "perfectly proper" is of dubious authority, at least in light of current case law concerning the procedural rights of attorneys. See, e.g., Johnson v. Trueblood, 629 F.2d 302 (3d Cir.1980)
 
 
 [49]
 For example, the court may issue a formal reprimand or, in more serious cases, a contempt citation either during or after the proceedings; it may also refer possible ethical improprieties to the disciplinary bodies of the local bar or, in the case of attorneys admitted pro hac vice, to the bar of the attorney's home state
 
 
 [50]
 Three days of hearings and eight months of deliberation intervened between the Order to Show Cause and the final decision. We therefore decline to read the allegations of the Order to Show Cause as findings of fact by the district court, as the defendant appears to urge us to do. See, e.g., Brief for Appellee at 17, 43, 44
 
 
 [51]
 The defendant argues that Allis' conduct is at least as blameworthy as the conduct found to warrant revocation of pro hac vice status in United States v. Madsen, 148 F.Supp. 625 (D.Alaska 1957). In Madsen, the defense attorney in a murder case had trespassed on police property, entered the car in which the victim was shot, and physically altered the appearance of the bullet hole. Id. at 628. Defendant's attempt to analogize Allis' conduct to that in Madsen must be characterized as advocacy in the extreme, and only highlights the equivocal nature of the charges against Allis. Other cases relied on by the defendant involve lawyers bribing or coercing witnesses not to testify or to testify falsely. See, e.g., United States v. Fayer, 523 F.2d 661 (2d Cir.1975); People v. Kenely, 648 P.2d 1065, 1066 (Colo.1982). No such conduct was found by the district court here
 
 
 [52]
 Hearing of June 30, 1983 (Allis), J.A. 946-47, 966-67
 
 
 [53]
 Hearing of Mar. 15, 1983 (Allis), J.A. 809-10
 
 
 [54]
 In arguing that the paycheck was "remuneration" beyond what was due to Janowski, defense counsel makes much of the fact that she had performed virtually no work during the pay period. Not only did the pay period extend over the Christmas and New Year's holidays, but there is also uncontradicted testimony that the firm was rather liberal in permitting employees personal time off--time not counted against vacation pay--while continuing to pay their regular salary. Janowski herself had been given several days off months earlier when her brother was injured. Hearing of June 30, 1983 (Allis), J.A. 949-50
 
 
 [55]
 Hearing of June 30, 1983 (Lumbard), J.A. 1039. See also id. (Austern), J.A. 996
 
 
 [56]
 See, e.g., ABA Comm'n on Ethics and Professional Responsibility, Formal Op. 337 (1974); NY Bar Ass'n Comm. on Professional Ethics, Op. 328 (1974). These and other bar opinions on the ethics of surreptitious recording appear at J.A. 248-68
 
 
 [57]
 See Hearing of June 30, 1983 (Austern), J.A. 1017-18; id. (Lumbard), J.A. 1030-32
 
 
 [58]
 We express no view as to the proper resolution of any problems that could arise in future proceedings if Janowski appears as a witness for the defendant and plaintiffs seek to impeach her testimony. Cf. Rosen v. NLRB, 735 F.2d 564 at 573-576 (D.C.Cir.1984) (where testimony as to attorney's conduct at prior meeting was critical evidence undermining client's position, attorney should have withdrawn to testify as to meeting). Although we do not foreclose the pretrial inquiry that the concurring judge would mandate, neither do we believe it is our function to take up this issue sua sponte, speculate on possible future scenarios in which the problem could arise, and instruct the district court as to how to deal with it
 
 
 [59]
 It is not clear to us why it was necessary, once the court had concluded that Janowski's testimony as to any conversation with Mrs. Koller was simply evidence for the jury to consider, see supra note 29, to hold immediate evidentiary hearings on the propriety of Allis' conduct several months earlier. These proceedings and the court's subsequent deliberations appear to have been primarily responsible for over a year's delay in the trial of this action
 
 
 [60]
 See Hearing of Mar. 27, 1983, J.A. 639-2
 
 
 [61]
 See supra pp. 1043-1044. Defense counsel asserts that the December 23 telephone call was solely for the purpose of attempting to set up a meeting with the court as soon as possible
 
 
 [62]
 Defense counsel contends that Schuck is a reputable attorney not personally known to them and that he has complete independence in his representation of Janowski. Plaintiffs dispute Schuck's independence, in light of the source of his fee and his firm's representation of other drug companies involved in litigation, including birth defect litigation, in which the Butler firm is opposing counsel. Affidavit of Butler, Jan. 5, 1983, J.A. 283
 
 
 [63]
 See CBS, Inc. v. Young, 522 F.2d 234 (6th Cir.1975) (vacating order prohibiting counsel, parties, friends and relatives from discussing case with press). We note that protective orders will more readily pass constitutional muster in the very distinct context of information obtained through civil discovery. See Seattle Times Co. v. Rheinhart, --- U.S. ----, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); cf. In re San Juan Star Co., 662 F.2d 108 (1st Cir.1981) (upholding order found to be "least restrictive means" possible under extreme circumstances of case). As far as we can tell, none of the information released by Butler was obtained through discovery
 The public importance of many issues involved in civil litigation is frequently cited as a reason for limiting the application of restrictions on press commentary by attorneys in civil cases. See, e.g., In re Halkin, 598 F.2d 176, 187 (D.C.Cir.1979); Hirschkop v. Snead, 594 F.2d 356, 373 (4th Cir.1979); Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 258 (7th Cir.1975), cert. denied sub nom. Cunningham v. Chicago Council of Lawyers, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976).
 
 
 [64]
 See Garris v. United States, 390 F.2d 862, 865 (D.C.Cir.1968); Reichert v. United States, 359 F.2d 278, 282 (D.C.Cir.1966)
 
 
 [65]
 Two courts of appeal have struck down the ABA rules prohibiting public comment by lawyers in civil cases as unconstitutional restraints on attorney speech. See Hirschkop v. Snead, 594 F.2d at 373; Chicago Counsel of Lawyers v. Bauer, 522 F.2d at 257-59
 
 
 [66]
 The Fourth Circuit in Hirschkop, in reviewing the background of ABA DR 7-107, had occasion to comment on its predecessor, ABA Canon 20, the text of which has been adopted as the current D.C. version of DR 7-107(H). The court commented as to Canon 20 that "as long as the standards were so general and unspecific, and in the presence of First Amendment rights, punishment should be meted out only to the most flagrant offenders." 594 F.2d at 365
 
 
 [67]
 Nor, of course, do we purport to determine the manner in which the local Legal Ethics Committee should interpret the phrase "substantial threat to the due administration of justice."
 
 
 [68]
 Hearing of Feb. 17, 1983, J.A. 615-18
 
 
 [69]
 This would be a different case if Butler had released the information in the middle of trial when jurors would be highly alert to any articles about Bendectin and birth defects
 
 
 [70]
 Several courts have pointed out that the danger of jury prejudice due to publicity is much less in civil than in criminal cases and can generally be alleviated without broad prohibitions on press commentary by lawyers. See, e.g., In re Halkin, 598 F.2d at 192-93; Hirschkop v. Snead, 594 F.2d at 373; Chicago Council of Lawyers v. Bauer, 522 F.2d at 257-58
 
 
 [71]
 As we explain supra pp. 1055-1056, in some situations--especially conflicts of interest or likely appearance by counsel as a witness--continued representation by counsel may taint future proceedings; in those cases a pretrial inquiry and possibly disqualification may be necessary